**BARCELLOS AND WOLFSEN, INC., et al., Plaintiffs,**

v.

**WESTLANDS WATER DISTRICT, et al., Defendants.**

No. CV–F–79–106 OWW.

United States District Court, E.D. California, Fresno Division.

June 18, 1993.

Opinion Denying Motion for Additions or Amendments to Decision Sept. 10, 1993.

---

William M. Smiland, Donnelly, Clark, Chase & Smiland, Los Angeles, CA, Maria A.

Iizuka, U.S. Dept. of Justice, Thomas W. Birmingham, Forrest A. Plant, Sacramento, CA, for plaintiff.

Theodore A. Chester, Jr., Donnelly Clark Chase and Smiland, Los Angeles, CA, for Barcellos and Wolfsen, Inc.

Thomas William Birmingham, Kronick Moskovitz Tiedemann and Girard, Sacramento, CA, for Westlands Water Dist.

Maria A. Iizuka, U.S. Dept. of Justice, Land and Natural Resources Div., Sacramento, CA, for U.S.

Thomas Marcuson, Smurr Henry and Gelegan, Fresno, CA, for Gary Hughes.

Larry W. Telford, Severson and Werson, San Francisco, CA, for Catellus Development.

## MEMORANDUM OPINION AND ORDER RE: MOTION TO ENFORCE JUDGMENT

WANGER, District Judge.

Over seventy landowners and water users ("Movants") within "Area I" of Westlands Water District, as defined in paragraph 1.14 of the stipulated judgment entered in this case in 1986 ("Judgment"), seek enforcement of the Judgment requiring Federal Defendants to sell Westlands irrigation water.[1]

## I. Background

The following facts are undisputed: Westlands entered into a water service contract with the United States in 1963 under which the United States, through the Bureau of Reclamation, agreed to make available for Westlands' purchase 900,000 acre-feet of water from the San Luis Unit of the Central Valley Project ("CVP"). Movants are third party beneficiaries of the 1963 contract. Section 4.1 of the Judgment states that Westlands and the United States "shall perform the 1963 Contract." Section 3 allows any party to the Judgment to obtain relief from violation of the Judgment by filing a motion in this Court sixty days after written notice is provided all other parties. Sufficient notice was provided by Area I representatives.[2]

On April 7, 1993, the Bureau announced its updated allocations of CVP water for various uses for water year 1993–94. Agricultural contractors south of the Sacramento–San Joaquin Delta, such as Westlands, are to receive 50 percent of their contractual supply of water. Other sources are to receive from 75 to 100 percent of their normal allotment. Acts taken by the Bureau in complying with

1. Paragraph 4 of the Judgment states that "[t]he parties entitled to file such a motion ... shall be limited to the Area representatives provided for in Paragraph 22 ..." Paragraph 22.2 lists the representatives of Area I as "Boston Ranch Company, Edwin O'Neill, Frank Orff, Y. Stephen Pilibos and Fabry Farms." In their papers, Movants assert that this motion to enforce is brought by dozens of landowners, including O'Neill, Orff, and Pilibos. Under the terms of the Judgment, the motion is properly brought only by these three individuals.

2. Representatives of landowners and water users in Area II have filed a document captioned "Response to Motion to Enforce Judgment." The document states that the Area II representatives support the motion and requests the Court to similarly enforce their alleged rights to an additional 250,000 acre-feet of water arising from paragraph 5 of the Judgment (Movants' claim is based on paragraph 4).

 Federal Defendants properly object to this request on procedural grounds, as the Area II representatives have not provided the 60–day written notice required by paragraph 3 of the Judgment. The November 1992 notice sent by Area I representatives specifically raises claims only as to water to be provided Area I under the 1963 service contract. The Area II representatives received this notice six months ago, yet have not filed notice of their claims. The Area II representatives claim that Federal Defendants are not prejudiced by the Court considering its additional claims at this time, yet they also assert that their right to the 250,000 acre-feet arises not from the 1963 Contract, but from the Judgment itself. Federal Defendants have not had the opportunity to brief these separate and new claims. Conversely, the Area II representatives state they will be affected by any ruling as to the claims raised by the Area I Movants. As resolution of the Area I Movants' claims relies primarily on interpretation of the 1963 Contract, rather than the Judgment, any adverse effect would appear minimal. In any case, the Area II representatives have brought this situation on themselves by failing to follow the procedure provided in the Judgment.

 Westlands has also filed a memorandum in support of Area I's motion. It has not been considered.

the Endangered Species Act [3] (ESA) and the newly enacted Central Valley Project Improvement Act [4] (CVPIA) have significantly impacted its allocation decisions. In particular, in response to the listing by the Secretary of Commerce of the winter-run chinook salmon and Delta smelt as threatened species, [5] operating limitations have been imposed on the pumps which bring water to users south of the Delta.

Movants argue that the 1963 contract imposes a non-alterable contractual obligation on the part of the Federal Defendants to provide no less than 900,000 acre-feet of water to Area I in water year 1993–94. They seek a declaration that Federal Defendants are required to make available for sale all 900,000 acre-feet, or in the alternative, an order 1) requiring Federal Defendants to pay an amount per acre foot necessary to procure substitute water from other sources, 2) enjoining Federal Defendants from enforcing liens or collecting assessments on Area I land, under the 1965 repayment contract, and 3) enjoining Federal Defendants from enforcing the ten-year sale restriction under deed arising from sale of excess lands in Area I.

## II. Standards for Interpreting Contract Provisions

Federal common law controls the interpretation of a contract entered pursuant to federal law when the United States is a party. *Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1032 (9th Cir.1989). "A written contract must be read as a whole and every part interpreted with reference to the whole. Preference must be given to reasonable interpretations as opposed to those that are unreasonable, or that would make the contract illusory." *Id.*

"Extrinsic evidence is inadmissible to contradict a clear contract term...." *Pierce Cty. Hotel Emp. & Rest. Emp. Health Trust v. Elks Lodge, B.P.O.E. No. 1450,* 827 F.2d 1324, 1327 (9th Cir.1987). On the other hand, "where a contract's meaning is not clear on its face, its interpretation depends upon the parties' intent at the time it was executed." *Arizona Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund v. Conquer Cartage Co.,* 753 F.2d 1512, 1515 (9th Cir.1985) (quotation omitted). The basis for the rule that "extrinsic evidence [is] inadmissible to interpret, vary or add to the terms of an unambiguous written instrument" is that

> [i]f parties to an agreement could not rely on written words to express their consent to the express terms of that agreement, those words would become little more than sideshows in a circus of self-serving declaration[s] as to what the parties to the agreement really had in mind. The parole evidence rule thus enables parties to rely on written instruments as embodying a complete memorial of their agreement, and to avoid costly and disruptive litigation over the existence of oral and implied terms that may or may not have been contemplated by the parties.

*Wilson Arlington Co. v. Prudential Ins. Co.,* 912 F.2d 366, 370 (9th Cir.1990).

"The existence of an ambiguity must be determined as a matter of law." *State Farm Mut. Auto. Ins. Co. v. Fernandez,* 767 F.2d 1299, 1301 (9th Cir.1985). "A contract is ambiguous if reasonable people could find its terms susceptible to more than one interpretation." *Kennewick Irrigation Dist.,* 880 F.2d at 1032. " 'The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous.' " *Id.* (quoting *International Union of Bricklayers & Allied Craftsman Local No. 20 v. Martin Jaska, Inc.,* 752 F.2d 1401, 1406 (9th Cir.1985)).

## III. Discussion

Federal Defendants do not contest that the 1963 contract obligates the Bureau to provide 900,000 acre-feet of water annually. Yet they contend that the Bureau's compliance with the ESA and the CVPIA has made it impossible to deliver Westlands' entire allocation. They also correctly note that the

**3.** 16 U.S.C. § 1531 *et seq.*

**4.** Pub L. No. 102–575, 106 Stat. 4600.

**5.** The chinook salmon was listed as a threatened species in November of 1990. The Delta smelt was listed in March, 1993.

contract contains a provision limiting that obligation in case of shortage. Any contractual rights Area I landowners and water users have in the 900,000 acre-feet of water is limited by Article 11, which states, in pertinent part:

(a) There may occur at times during any year *a shortage in the quantity of water available for furnishing to the District* through and by means of the Project, but *in no event shall any liability accrue against the United States* or any of its officers, agents, or employees for any damage, direct or indirect, *arising from a shortage on account of* errors in operation, drought or *any other causes....*[6]

(b) In the event that in any year there is delivered to the District by reason of *any shortage* or apportionment as provided in subdivision (a) of this article or any discontinuance or reduction of service as set forth in subdivision (d) of Article 9 hereof, less than the quantity of water which the District otherwise would be entitled to receive, there shall be made an adjustment on account of the amounts paid to the United States by the District for water for said year in a manner similar to that provided in Article 7. To the extent of such deficiency, *such adjustment shall constitute the sole remedy of the District or anyone having or claiming to have by, through, or under the District the right to the use of any of the water supply provided for herein.* (emphasis added).

Under Article 11, Movants are claiming "by, under, or through the District," and are entitled to the full contractual allotment only to the extent that a shortage has not arisen due to "any cause." If they are provided less, their sole remedy is an adjustment in their payments.

The parties to the stipulated judgment recognized that this shortage provision was an integral part of the service contract. Paragraph 17.5 of the Judgment states:

*In years of water shortage when water deliveries to Central Valley Project water contractors are reduced by the Federal Parties under their respective water service contracts,* deliveries to and within the District of water purchased under Article 3 of the 1963 Contract to which the water users in Area 1A and Area 1B have prior rights shall be proportionally reduced along with deliveries to and within the District of the additional water from the Central Valley Project to which lands in the District are entitled. (emphasis added).[7]

Movants contend that Article 11 is invalid because Federal Defendants have "expressly warranted that the water in question can and will be available, and done so repeatedly." They cite case law in which courts have denied operative effect to contract clauses which limit or negate express warranties. That is, Article 11 cannot serve to limit the government's liability because Federal Defendants expressly warranted that water would be available. Movants fail to establish the existence of such an express warranty. They cite extrinsic evidence such as statements made by President Kennedy in the ground-breaking ceremony for the San Luis Unit and a letter written in September of 1960 by the Bureau's assistant regional director. The three provisions of the 1963 contract which they cite create no "warranty of availability."[8] The weakness of Movants'

---

6. The remainder of Section (a) gives the Bureau the right to apportion the available water supply among the District and "others entitled under the then existing contracts" should a shortage occur. Neither party suggests that the Bureau has invoked this right of apportionment. The language of section 11(b) makes clear that a shortage can exist without an apportionment occurring.

7. Paragraph 25 of the Judgment states that the provisions of paragraph 17 apply only among the District and its intra-district entities and are not intended to benefit the United States. This does not prevent referencing the paragraph as evidence the parties recognized the existence and import of the shortage provision in the service contract.

8. Movants cite article 11(a) and the following two prefatory passages of the Act:

WHEREAS, investigations of the District's lands and present water supply indicate that irrigated and irrigable lands within the boundaries of the District are at present in need of additional water for irrigation and certain areas have a potential need of water for irrigation, that ground water underlying the District is seriously depleted and in need of replenish-

contention is demonstrated by the fact they cite to Article 11 itself as creating an express warranty. It does not.

■ Movants also object that Article 11 fails to provide minimum adequate remedies for breach and that its damage provision is unconscionable.[9] They additionally allege that Article 11 violates public policy as it exempts the government from responsibility for the willful injury of the property of another. Such arguments fail. The 1963 contract was the result of bargaining between sophisticated parties who foresaw the possibility that any number of circumstances, known or unknown, might limit the government's ability to deliver the contracted quantity of water. The broad language of Article 11 reflects this understanding. The damage provision allows for an adjustment in the purchase price should the government be unable to meet its water delivery obligations.[10]

The contract cannot reasonably be read "to allow the government to willfully injure Movants' property." Article 11 expressly excuses the water delivery obligations in the event of shortage from any cause. In this instance the cause allegedly arises from environmental requirements and reclamation needs arising from legislation enacted after the contract. Neither the ESA nor the CVPIA by their terms evidence intent of the United States to willfully injure Movants' property.

Nor is the language of Article 11 ambiguous. The terms at issue are not defined in the contract but they are clear on their face. There is but one reasonable interpretation of the term "shortage": a lack or deficit. Webster's New Collegiate Dictionary (5th ed. 1977). It is not possible to construe "cause" to connote anything but the obvious meaning: "something that brings about an effect or result." *Id.* It is also impossible to construe the term "any" to mean anything but "one or some indiscriminately of whatever kind." *Id.* There is no need to examine extrinsic evidence as to the parties' intended meaning.

Movants complain that interpreting the provision for "shortage" due to "any other causes" in a straightforward manner places no limitations on Federal Defendants' ability to create the "cause." Westlands, as the contracting party, did not include any language of limitation in the contract. There is no legal or equitable justification for rewriting the parties' contract. *See Travelers v. Budget Rent–A–Car Systems*, 901 F.2d 765, 767–69 (9th Cir.1990)

■ This is not to say that Movants cannot challenge any cause for a shortage, to show that the cause was unlawful or unreasonable under the contract. Yet, Federal Defendants allege that the shortages arise

ment, and that an additional water supply to meet these present and potential needs can be made available by and through the works constructed and to be constructed by the United States....
WHEREAS, investigations of the streamflow in the Sacramento River, the Trinity River, the American River, the San Joaquin River, and their tributaries indicate that there will be available for furnishing to the District from the San Luis Unit an additional water supply for surface diversion and direct application for irrigation and directly or indirectly to replenish depleted ground waters underlying the District.

9. Movants rely on the Uniform Commercial Code and California case law in advancing these arguments. Federal Defendants correctly note that federal law controls the interpretation of a contract entered pursuant to federal law when the United States is a party. *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir.1989). However, as the UCC is a source of

federal law common law, its provisions may be relied upon in interpreting such a contract. *See Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*, 730 F.2d 186, 188 (5th Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 515, 83 L.Ed.2d 405 (1984).

10. Movants allege that the damage provision violates UCC § 2719. Section 2719(1) states that an agreement may provide for substitute remedy provisions "as by limiting the buyer's remedies to return of the goods and repayment of the price ...." Movants argue that under § 2719(2), the government cannot enforce the limited remedy provision because its essential purpose has failed. There is no evidence that the essential purpose of the remedy provision has failed. *Cf. RRX Industries, Inc. v. Lab–Con, Inc.*, 772 F.2d 543 (9th Cir.1985) (essential purpose of remedy provision which provided that seller would repair software failed where seller unable or unwilling to repair product). Nor is § 2719(3) applicable, as the provision cannot be considered unconscionable.

from their mandatory compliance with federal statutes. Mandatory compliance with federal statutes is neither unlawful nor unreasonable.[11]

■ Movants contend that the contract created vested rights which cannot be altered by subsequent legislation. In *Cisneros v. Alpine Ridge Group*, —— U.S. ——, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993), the Supreme Court reversed a Ninth Circuit decision which held that legislation passed by Congress in 1989 violated the Due Process Clause of the Fifth Amendment by stripping HUD landlords of their vested rights as created by government contracts to automatic annual rent increases. The Court found it unnecessary to reach the constitutional issue because a provision of the contract to which the Court of Appeals failed to give proper effect limited the landlords' right to receive rent increases. "Because we find that respondents have no contract right to unobstructed formula-based rent adjustments, we have no occasion to consider whether [the challenged legislation] unconstitutionally abrogated such a right." *Id.* at ——, 113 S.Ct. at 1905. The express language of Section 11 negates any absolute contract right in Movants to the unqualified delivery of irrigation water.[12]

Movants contend that through the incorporation of reclamation law in the 1963 contract, the obligation of the Federal Defendants to supply water is statutory in nature. Any statutory rights which Movants possess as a result of the 1963 contract can be no broader than their contractual rights. Movants implicitly concede that both types of rights are identical in scope: "[a] farmer's water right under his service, repayment and recordable contracts with the government constitute a property right appurtenant to his land."

Nor does the existence of the Judgment make Movants' rights to the water more expansive or of a different legal nature than as provided in the 1963 contract. As the Ninth Circuit stated in *Barcellos II*, "All the judgment requires is for the 1963 Contract to be performed. We have already held that [the new legislation] is not inconsistent with the 1963 Contract." 899 F.2d at 826.

As stated above, Movants may attempt to establish that the cause of shortage was unlawful or unreasonable under the contract, but Federal Defendants can rebut Movants' showing by demonstrating that the shortage was caused by the Bureau's mandatory compliance with the ESA and/or the CVPIA. At oral argument, Movants confirmed that they assert three acts caused the Bureau to determine a shortage exists: 1) the Bureau's compliance with the biological opinion as to the winter-run salmon;[13] 2) planning done by the Bureau in anticipation of the requirements expected to be imposed by the Delta smelt biological opinion; and c) the Bureau's allocation of water to refuges south of the Delta under the Central Valley Project Improvement Act.

Movants make a number of legal challenges to these alleged acts. Many must be rejected as they are incorrectly premised on the Movants having an absolute right under the 1963 contract and/or reclamation law to a full allocation of water. These arguments are: 1) the government owes mandatory duties to sell and deliver to Area I the water in question under reclamation law; 2) when

11. Federal Defendants have not suggested that the Bureau's allocation decisions were based on its *voluntary* compliance with federal or state law, or that a shortage may be created under the contract by acts not *required* by law.

12. Movants lost a similar argument in litigation referred to as *Barcellos II*, 899 F.2d 814 (9th Cir.), *cert. denied*, 498 U.S. 998, 111 S.Ct. 555, 112 L.Ed.2d 562 (1990). Movants moved to enforce the Judgment, asserting the Judgment required the Bureau to provide CVP water for excess lands under extended recordable contracts at a subsidized price regardless of a change in federal law. The Ninth Circuit affirmed this Court's dismissal of the action by concluding that the landowners had no contractual right to receive subsidized water, and therefore, a change in law did not deprive them of any property right.

13. The National Marine Fisheries Service issued a Biological Opinion on February 12, 1993, as to the Winter–Run Chinook Salmon. The Opinion states that jeopardy to the species can be avoided by the Bureau operating its Delta pumps in a specified manner. The operational criteria outlined in the Opinion limits the Bureau's ability to pump water to areas south of the Delta.

contradictory mandatory duties are created under reclamation law and the Endangered Species Act, reclamation law controls; 3) the ESA and CVPIA are unconstitutional as applied as they violate Area I's contract rights under the due process clause; and 4) the ESA and CVPIA are unconstitutional as applied as they violate rights created by the Judgment under the separation of powers doctrine.

Movants additionally allege that Section 3408(k) of the CVPIA forbids the use of water for wildlife refuges to the extent it infringes on the Movants' prior rights to its use.[14] Section 3406(d) requires the Bureau to provide water to the refuges. Section 3408(k) provides in part, "nothing in this title is intended to alter the terms of any final judicial decree confirming or determining water rights." Movants additionally cite legislative history in which Senator Malcolm Wallop stated that he had been successful in obtaining "protection of all court decrees, including the *Barcellos* decree involving Westlands ..." 138 Cong.Rec. S17659, S17660 (October 8, 1992).

Under the Judgment, which mandates enforcement of the 1963 contract, Westlands' water rights are limited by the shortage provision contained in Article 11. No impairment of the Barcellos judgment occurs, as the 1983 contract is being performed in accordance with its terms. Section 3406(d) requires the Bureau to provide water to wildlife refuges. The result of compliance with section 3406(d) is a shortage in water to deliver to satisfy the Bureau's contractual obligations to Westlands.

Movants further contend that the Bureau cannot make allocation decisions based on restrictions, which it believes will be imposed under the unissued Delta smelt biological opinion. This issue is moot as the biological opinion was issued on May 28, 1993. In any

case, 16 U.S.C. § 1536(a)(2) requires the Bureau to "insure that any action authorized, funded, or carried out ... is not likely to jeopardize the continued existence of any ... threatened species...." Movants provide no authority that suggests that this obligation is suspended pending issuance of a biological opinion.

■■■■ Two of Movants' arguments remain: 1) the Bureau must complete an Environmental Impact Statement prior to complying with the CVPIA and the biological opinions; and 2) the biological opinion issued as to the winter-run chinook salmon is inadequate.[15]

These remaining arguments concern the Bureau's *method* of compliance with the ESA and the CVPIA, rather than the *necessity* of the Bureau's compliance. In *Alpine Ridge,* the Supreme Court stated, "If respondents have been denied formula-based rent increases based on shoddy comparisons, *their remedy is to challenge the particular study, not to deny HUD's authority to make comparisons.*" — U.S. at ——, 113 S.Ct. at 1904. The proper forum to raise Movants' remaining issues is a separate suit in which all the necessary parties are named, rather than a motion to enforce the 1986 Judgment. Movants lack procedural standing to challenge the adequacy of the biological opinion, as the present action does not name the National Marine Fisheries Service or the Department of Commerce, nor have the Fisheries Service or the Department of Commerce been provided sixty days notice of Movants' intent to file suit under ESA, as required by 16 U.S.C. § 1540(g).

On May 17, 1993, Westlands filed suit alleging the biological opinion is inadequate and an EIS is required.[16] The Bureau, the National Marine Fisheries Service, and the Secretaries of Commerce and Interior are named as defendants. Proper notice appears

---

**14.** In its briefs, the government states 250,000 acre-feet of water have been allocated for delivery to "federal wildlife refuges and state wildlife management areas as required by Section 3406(d) of CVPIA."

**15.** Movants allege the National Marine Fisheries Service, an agency of the Department of Commerce, violated the ESA by failing to use the best scientific and commercial data available in deter-

mining the causes of the "jeopardy" facing the species, *i.e.,* the causes of its threatened status, and did not provide a summary of information detailing how water deliveries affect the winter run of the salmon.

**16.** Case number CV–F–93–5327–OWW–SSH ("Westlands' case").

to have been provided. While Westlands and its member landowners and water users may have differing interests as to how water is divided within the water district, their interests in obtaining water from the Bureau under the 1963 service contract appear to be identical.[17] No request has been made for consolidation of the Westlands' case with this action.

## IV. Conclusion

The Motion To Enforce Judgment is DENIED, without prejudice, pending the outcome of the Westlands' case. Should Westlands succeed these, the Movants may renew their motion, and attempt to demonstrate that the Bureau acted in an unreasonable manner, not contemplated by the parties to the 1963 contract in curtailing their allotment of water.

SO ORDERED.

## MEMORANDUM OPINION AND ORDER DENYING MOTION FOR ADDITIONAL AND AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

On June 18, 1993, the Court issued a memorandum opinion and order denying a motion brought by landowners and water users within "Area I" of Westlands Water District ("Movants") to enforce the 1986 stipulated judgment in a manner which would require Federal Defendants to sell irrigation water to Westlands. On July 8, 1993, Movants filed the present motion, captioned "Motion for Additional and Amended Findings of Fact and Conclusions of Law." Movants allege that the motion is brought pursuant to Fed. R.Civ.P. 52(b), 59(a), 60(b) and Local Rule 230(k).

Movants provide 16 specific statements which they allege are "new and additional findings of fact and conclusions of law based on evidence adduced and arguments made in the prior motion proceeding, but not addressed" in the memorandum opinion:

(1) The words "no ... liability ... for ... damage" in Article 11 of the 1963 Contract mean only no liability for money damages;

(2) The phrase "quantity of water available" in Article 11 means the quantity of water which is physically accessible prior to allocation for environmental uses;

(3) The government has an obligation under reclamation statutes, which is incorporated into the 1963 Contract, to recognize Movants' right to the beneficial use of the diverted water;

(4) Article 11, properly interpreted, neither negates nor limits said obligation;

(5) The government has an obligation under Article 3(f) of the 1963 Contract not to disturb Movants' right to the beneficial use of said water;

(6) Article 11, properly interpreted, neither negates nor limits said obligation;

(7) The government has an obligation under reclamation statutes, which is incorporated into the 1963 Contract, to give priority to irrigation uses over nonirrigation uses;

(8) Article 11, properly interpreted, neither negates nor limits said obligation;

(9) The government has an obligation under reclamation statutes, which is incorporated into the 1963 Contract, not to donate said water without receiving payment therefor;

(10) Article 11, properly interpreted, neither negates nor limits said obligation;

(11) Article 11, as interpreted by the government; unreasonably negates the government's express warranty that said water would be available to Movants and is, therefore, inoperative;

(12) Article 11, as interpreted by the government, is unenforceable, because it is unreasonable to fix Movants' liquidated damages for said diversion at zero dollars;

(13) The government's statutory obligations to recognize Movants' right to the beneficial use of said water, to give priority to irrigation over nonirrigation uses, and not to donate said water free of charge are mandatory obligations;

(14) Diverting said water in violation of said reclamation statutes is neither mandated nor permitted under the Endangered Species Act ("ESA"), nor the Cen-

---

17. If this is not the case, Area I may attempt to intervene in the Westlands litigation.

tral Valley Project Improvement Act ("CVPIA");

(15) The government must reconcile its obligations under said reclamation statutes with any conflicting obligations under ESA or CVPIA by fulfilling its obligations under said reclamation statutes; and

(16) Diverting said water was not done in compliance with either ESA nor CVPIA.

Movants additionally "seek the following amendments to findings of fact and conclusions of law set forth in the" memorandum opinion:

(17) The words "any other causes" in Article 11 exclude the government's diversion of said water;

(18) The government made an express warranty that said water would be made available to Movants;

(19) Article 11, as interpreted by the government, is unenforceable because circumstances cause it to fail of its essential purpose;

(20) Article 11, as interpreted by the government, is unenforceable, because it is unconscionable;

(21) Article 11, as interpreted by the government, is unenforceable because it exempts the government from responsibility for its own willful injury to Movants' property; and

(22) Article 11, as interpreted by the government, does not negate nor limit the government's obligations to Movants under said reclamation statutes.

## I. Jurisdiction

Federal Defendants raise three challenges to the Court's jurisdiction to hear the motion.

### A. *Timeliness of Motion*

Federal Defendants contend that the motion was not timely filed. Rule 59(b) provides: "A motion for a new trial shall be served not later than 10 days after the entry of judgment." Rule 52(b) contains an identical limitation period. In their papers, both parties have implicitly assumed that the court's memorandum opinion and order was the equivalent of a final judgment (Movants have also filed an appeal based on the opin-

ion). Thus, both parties have assumed the 10–day rule is applicable here.

It is unnecessary to analyze that assumption, as the motion is timely in any case. The opinion and order was signed and filed on June 18, 1993, but the Court's records indicate the Clerk did not enter it onto the docket until June 22, 1993. Both Rules 52(b) and 59(b) state that the time for motions runs from "*entry* of judgment." Rule 6(a) provides that the first day of the time period is not counted, nor, in cases where the time allowed is less than 11 days, are weekends or holidays. Rule 59(b) provides that the motion must merely be served, not filed, within 10 days. The certificate of service attached to the motion indicates the motion was served on July 7, 1993, the final day of the time period.

At the hearing, Movants requested that the Court also consider the motion as made under F.R.C.P. Rule 60(b). Rule 60(b) motions need not be brought within 10 days of entry of judgment.

### B. *Effect of Appeal*

█ Federal defendants' letter of August 20, 1993, questioned whether the district court was divested of jurisdiction to consider this motion by Movants' August 17, 1993, notice of appeal from the Court's order. Fed.R.App.P. 4(a)(4) states:

If a timely motion under the Federal Rules of Civil Procedure is filed in the district court by any party; (i) for judgment under Rule 50(b); (ii) under Rule 52(b) to amend or make additional findings of fact, whether or not an alteration of the judgment would be granted if the motion is granted; (iii) under Rule 59 to alter or amend the judgment; or (iv) under Rule 59 for a new trial, the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying any other such motion. *A notice of appeal filed before the disposition of any of the above motions shall have no effect....*

As Movants' motion was timely filed pursuant to Rules 52(b) and 59(b), the appeal was premature and does not divest this Court of jurisdiction.

## C. *Grounds for the Motion*

Federal Defendants contend that the present motion, while based on 52(b) and 59(a), is more properly termed a motion to reconsider. As with a motion for summary judgment, resolution of the underlying motion required application of legal principles to facts which were not in dispute.[1] Movants contend that the Court did not fully consider their arguments and/or erred in applying the law. Movants concede that they seek reconsideration by seeking relief under Rule 60(b) and Local Rule 230(k).[2]

▆▆▆ In the absence of an allegation of a change in the law or the existence of new evidence, reconsideration is proper only "to correct a clear error or prevent manifest injustice." *Kern–Tulare Water District v. City of Bakersfield*, 634 F.Supp. 656, 665 (E.D.Cal.1986), *aff'd in part and rev'd in part on other grounds*, 828 F.2d 514 (9th Cir.1987), *cert. denied*, 486 U.S. 1015, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988). A finding of "extraordinary circumstances" is required to grant relief under Rule 60(b)(6). *Backlund v. Barnhart*, 778 F.2d 1386, 1388 (9th Cir.1985). Thus while the Court has jurisdiction to hear the motion, relief may be granted to Movants only upon a showing of extraordinary circumstances, a clear error of law, or manifest injustice.

## II. Discussion

### A. *Availability of Injunctive Relief*

▆▆▆ Movants assert that the Court failed to consider their rights to injunctive relief. They assert that because subsection (a) of Article 11 states that "... in no event shall any liability accrue against the United States ... for any damage, direct or indirect, arising from a shortage on account of errors in operation, drought or any other cause," Article 11 "merely limit[s] the government's liability for money damages but [has] no further effect, including any effect on any equitable remedy."

Movants ignore subsection (b) of Article 11, which states, in part, that "an adjustment on account of the amount paid to the United States ... shall constitute the *sole remedy* of the District or anyone having or claiming to have by, through, or under the District the right to the use of any of the water supply...." The memorandum opinion emphasizes the pertinent language in both subsections and concludes:

> Under Article 11, Movants are claiming "by, under, or through the District," and are entitled to the full contractual allotment only to the extent that a shortage has not arisen due to "any cause." If they are provided less, their sole remedy is an adjustment in their payments.

Opinion at 722. In using the phrase "sole remedy," the parties did not differentiate between money damages and any equitable remedy.

Movants provide no authority why the contract that limits remedies as specified in Article 11(b) should not be given effect.

### B. *Interpretation of the Term "Available"*

▆▆▆ Subsection (a) of Article 11 states, in part:

> There may occur at times during any year a shortage in the quantity of water available for furnishing to the District through and by means of the Project, but in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising from a shortage on account of errors in operation, drought or any other causes....

Movants allege that the phrase "quantity of water available" refers to the quantity of water *physically accessible before allocation to various users*. That is, if there is at least 900,000 acre-feet of water somewhere, there is available water and no shortage exists. This interpretation is directly affected by the

---

1. For instance, it was determined that no express warranty of availability was created on the facts as presented by the Movants and not disputed by Federal Defendants.

2. Captioned "Applications for Reconsideration," Rule 230(k) applies "[w]henever any motion has been granted or denied in whole or part, and a subsequent motion for reconsideration is made."

 Movants have not alleged that the motion is brought pursuant to Rule 59(e).

entire phrase: "the quantity of water available *for furnishing to the District through and by means of the Project* ..." Article 1(b) defines "Project" as the Central Valley Project. The plain language of the contract specifies that the parties contemplated that availability was not to be determined prior to allocation to all users by the phrase "... at times during any year ..." This language means that the determination of available water is one that continues during the year.

Evaluation of water supply for shortages is ongoing from the start to the end of a year. All causes that reduce or increase available water "through the Central Valley Project" are to be considered on a continuing basis. A view that freezes the quantification of available water at a single point in time is inconsistent with this language and the history by which shortages have been determined in the past. The memorandum opinion holds that the contract cannot be read so broadly as to allow Federal Defendants to employ unlawful or unreasonable "causes" to create a shortage. Opinion at 725. "Yet, Federal Defendants allege that the shortages arise from their mandatory compliance with federal statutes. Mandatory compliance with federal statutes is neither unlawful nor unreasonable." *Id.* Movants remain free to attempt to establish that the Federal Defendants' action in complying with federal statutes is unlawful or unreasonable. *Id.* at 724–725.

The existence of a shortage and the lack of available water are two sides of the same coin. In the same manner that Movants may attempt to prove that the shortage was illegally caused or arbitrarily and capriciously contrived, they may attempt to prove that Federal Defendants have illegally or arbitrarily withheld the amount of available water. Movants are free to challenge whether the Bureau's water allocation is mandated by law and the substantive and procedural validity of water allocations under that law, as applied. The shortage provisions in the contract bar the assertion that the Bureau's failure, at any time during a year, to deliver 900,000 acre-feet of water is, in and of itself, a breach.

### C. *Whether Compliance with Newly Enacted Law Creates a Shortage from Any Cause*

Movants summarize the memorandum opinion to hold "that the words 'any' and 'cause,' as used in Article 11, are 'clear on their face,' and that the Court will not re-write the 1963 Contract to place 'limitations on Federal Defendants' ability to create the cause.'" By taking the language of the opinion out of context, Movants misinterpret its holding. The opinion expressly states that the Bureau is *not* free to create any cause for a shortage. Movants may challenge the allocation of water on grounds that the shortage was created by arbitrary and capricious or illegal causes. Westlands and the United States, both sophisticated parties, chose to use a broad phrase—"shortage on account of ... any other causes." Mandatory compliance with valid federal law meets the definition of "other cause."

Movants cite a 1954 Alabama district court case, *Gulf, Mobile & Ohio Railroad Co. v. Illinois Central Railroad Co.*, 128 F.Supp. 311, 324 (N.D.Ala.1954), for the proposition that "implied in every contract is one's obligation not 'to take advantage of an obstacle to performance which he has created or which lies within his power to remove.'" While this is undoubtedly true, Movants have not established that the Federal Defendants have created an obstacle to their performance or have the ability to remove such an obstacle. Congress has mandated the use of Project water for environmental purposes.

Movants' motion was denied without prejudice so that they may attempt to make such a showing upon resolution of the suit filed by Westlands Water District.[3] The opinion states both that Area I may seek to intervene in that case, but that no request has been made for consolidation of the two cases. It is judicially inefficient to have two parallel cases proceeding simultaneously.

Movants further argued that 1) Article 11 was ambiguous and/or inapplicable and 2) that a government contract cannot be modified by subsequent legislation. In the memorandum opinion Article 11 was held to be

3. CV–F–93–5327–OWW–SSH.

both applicable and unambiguous. The second issue was not discussed, following the direction of the recent Supreme Court case, *Cisneros v. Alpine Ridge Group*, —— U.S. ——, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993), which criticized the Ninth Circuit for analyzing the identical issue, when a plain reading of a government contract made it clear that even without the subsequent legislation, no contract right existed.

 Assuming, *arguendo*, that Article 11 by its plain language is not controlling and the 1963 Contract obligates Federal Defendants to supply, without excuse, 900,000 acre-feet of water, Movants' argument is still based on the erroneous belief that Congress may never enact laws that have the direct or indirect effect of modifying existing contracts. Movants incorrectly contend that this modification effects a taking and violation of their due process rights.

The Supreme Court outlined the relationship between commercial contracts and subsequent legislation in *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986):

> While the Federal Government, as sovereign, has the power to enter contracts that confer vested rights, and the concomitant duty to honor those rights, we have declined in the context of commercial contracts to find that a "sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in" the contract. Rather, we have emphasized that "[w]ithout regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact *unless surrendered in unmistakable terms.*" ... Therefore, contractual arrangements, including those to which a sovereign itself is party, "remain subject to subsequent legislation by the sovereign."

477 U.S. at 52, 106 S.Ct. at 2396–97. (citations omitted, emphasis added).

The Ninth Circuit has applied *Bowen* in cases in which water districts have complained that their service contracts have been impacted by subsequent federal enactments. In *Peterson v. United States Dept. of the Interior*, 899 F.2d 799 (9th Cir.1990), the court determined that neither the due process or taking clauses prevented Congress from enacting legislation limiting the volume of subsidized water that water districts can deliver to leased lands under their pre-existing contracts with the Bureau. The court found that the water contracts created no constitutionally protected property interest in the continued delivery of water. "[B]ecause the water districts have no vested property right to buy reclamation water for delivery to leased lands, the restrictions imposed by [the new statute] do 'not effect a taking within the meaning of the Fifth Amendment.' For the same reason, the Water Districts' due process claim also must fail." *Id.* at 813.

*Peterson* found that no vested property right existed by examining the service contracts. *Id.* at 812. A vested property right would have existed only if the contract contained evidence that "Congress surrendered in clear and absolute language its right to impose express limitations on the size of leased tracts that could receive reclamation water." *Id.* at 808–09. The court alternately concluded that "[o]ur rejection of the Water Districts' claim to a vested contract right finds further support in the Supreme Court's decision in *Public Agencies*.... If anything, California had a greater claim to a vested right in *Public Agencies* than do the Water Agencies in this case because in *Public Agencies* the federal government had incorporated in an agreement with the states, an express promise that those entities could withdraw from the social security system. Nonetheless, the Court held that the contracts created no interests that were entitled to protection under the taking clause of the fifth amendment." *Id.* at 811.

A reading of the 1963 Contract reveals no language or intent that "Congress surrendered in clear and absolute language its right" to adjust the amount of water supplied under the contract. To the contrary, Article 11 specifically allows such adjustments when shortages occur.

### D. *Movants' Statutory Rights to Beneficial Use of the Water*

■ Movants assert they have statutory vested property rights in the water, which cannot be abridged. They contend that these rights arise from reclamation statutes incorporated in the 1963 Contract. The opinion concluded:

> Movants contend that through the incorporation of reclamation law in the 1963 contract, the obligation of the Federal Defendants to supply water is statutory in nature. Any statutory rights which Movants possess as a result of the 1963 contract can be no broader than their contractual rights. Movants implicitly concede that both types of rights are identical in scope: "[a] farmer's water right under his service, repayment and recordable contracts with the government constitute a property right appurtenant to his land."

Opinion at 724. Movants now reassert the proposition that by means of the incorporation of reclamation statutes into the contract, they have acquired a property right in the water greater than their contractual right. Thus, they contend even if the shortage provision in Article 11 limits their contractual rights to the water, they have a statutory right to the water with which the Bureau cannot interfere.

Movants focus specifically on 43 U.S.C. § 372, which provides:

> The right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right.[4]

Movants cite three cases, *United States v. Alpine Land & Reservoir Co.*, 697 F.2d 851 (9th Cir.), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983); *Nevada v. United States*, 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983); and *Ickes v. Fox*, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525 (1937), for the proposition that § 372 is applicable here. Of the three, *Ickes v. Fox* is closest to our case. *Ickes* stands for the proposition that under federal reclamation law, particularly section 372, a landholder who has entered into a contact for delivery of irrigation water and has applied it to a beneficial use has a statutory property right which cannot be unilaterally altered or taken away by the government. In *Ickes*, the landowners complied with all terms of the contract, but the federal government impermissibly threatened to cut their allocation. *See also Nevada v. United States*, 463 U.S. at 126, 103 S.Ct. at 2916 ("[T]he government is completely mistaken if it believes that the water rights confirmed to it ... were like so many bushels of wheat, to be bartered, sold, or shifted about as the Government might see fit.").

Yet, *Ickes* does not stand for the proposition that these property rights require the government to continue to deliver water in contravention of the water delivery contract, which defines the extent of the water right. The disputed contract grants specified water rights. The government is prohibited from breaching the terms of the contract. Treatises are clear on this point:

> The United States, of course, is compelled by *Ickes* only to fulfill its contracts. Thus, in *Fremont–Madison Irrig. Dist. v. United States Dep't of the Interior*, 763 F.2d 1084 (9th Cir.1985), the United States prevailed in a case involving its failure to deliver water. The water supply contract provided there would be no liability for water shortages resulting from the failure of facilities. When the Teton Dam broke, the irrigation district had no protectable property right to a continued water supply.

4 *Water and Water Rights*, (R. Beck, ed.) § 41.05(a) at 411 n. 214 (1991). In *Fremont–Madison*, an irrigation district argued that it had acquired a vested right to beneficial use of the water under federal law and state property law. The court rejected an argument analogous to that made by the Movants:

> Whatever the merits of this argument, we note that the [irrigation district] has only argued one side of the coin, *i.e.*, under Idaho law [as made applicable under federal law], "[t]he word property ... signifies

---

**4.** *See also* 43 U.S.C. § 485h–4.

all valuable rights or interests *which are protected by law.*" [citation omitted, emphasis in original]. The so-called "hold-harmless" clause of paragraph 33 of the 1969 contract states that "[n]o liability shall accrue against [the government] for ... shortages in the quantity of water ... resulting from the failure of facilities of the ... storage system...." In light of this clause, it is unclear just how the rights and interests claimed by the [irrigation district] would be protected by law. Absent such protection, they cannot rise to the level of "property" under the law of Idaho. *The [irrigation district]'s argument that [the federal statute] somehow unilaterally abrogated paragraph 33 of the 1969 contract is without merit.*

763 F.2d at 1088. Movants' argument that § 372 unilaterally abrogates the shortage provision of the present contract is meritless.

■ Even assuming, *arguendo,* that the Movants hold water rights based on statutes which are broader than their contractual rights, they are not exempt from compliance with environmental statutes. "The [Endangered Species Act] provides no exemption from compliance to persons possessing state water rights, and thus [the water district]'s state water rights do not provide it with a special privilege to ignore the Endangered Species Act." *United States v. Glenn–Colusa Irr. Dist.,* 788 F.Supp. 1126, 1134 (E.D.Cal.1992). If Congress has directed that the Bureau reserve water for environmental purposes, Movants cannot be heard to insist that their rights require the Bureau to disobey the law.[5]

### E. Federal Defendants' Contractual Duty Not to Disturb Movants' Right to the Beneficial Use of Water

Movants claim that their right to the beneficial use of the water is also contractual. Article 3(f) establishes such a contractual right, but it is subject to the remainder of the terms of the contract, including the shortage provisions:

The right to the beneficial use of water furnished to the District *pursuant to the terms of this contract* and any renewal hereof shall not be disturbed so long as the District shall fulfill all of its obligations under this contract and any such renewal.

(emphasis added). Article 3(f) creates no greater right to water than under the contract, which is limited by Article 11.

### F. Enforceability of Article 11

■ Movants reallege their claims that if the shortage provision is interpreted in the manner adopted by the Court, Article 11 is invalid.[6] The memorandum opinion stated:

Movants also object that Article 11 fails to provide minimum adequate remedies for breach and that its damage provision is unconscionable.[7] They additionally allege that Article 11 violates public policy as it exempts the government from responsibility for the willful injury of the property of another. Such arguments fail. The 1963 contract was the result of bargaining between sophisticated parties who foresaw the possibility that any number of circumstances, known or unknown, might limit the government's ability to deliver the contracted quantity of water. The broad language of Article 11 reflects this understanding. The damage provision allows for an adjustment in the purchase price should

---

5. Movants additionally allege, under the contract and reclamation law, that Defendants owe a duty to honor irrigation uses of the water over nonirrigation uses, along with a duty to sell the water to repay the costs of the project. Any such duties owed by the Federal Defendants are limited by the contract's shortage provision.

6. Without providing a basis for reconsideration, Movants also reallege that Federal Defendants breached an express warranty of availability. This issue was fully discussed in the memorandum opinion at pages 722–723.

7. Movants rely on the Uniform Commercial Code and California case law in advancing these arguments. Federal Defendants correctly note that federal law controls the interpretation of a contract entered pursuant to federal law when the United States is a party. *Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1032 (9th Cir.1989). However, as the UCC is a source of federal law common law, its provisions may be relied upon in interpreting such a contract. *See Clem Perrin Marine Towing, Inc. v. Panama Canal Co.,* 730 F.2d 186, 188 (5th Cir.), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 515, 83 L.Ed.2d 405 (1984).

the government be unable to meet its water delivery obligations.[8]

The contract cannot reasonably be read "to allow the government to willfully injure Movants' property." Article 11 expressly excuses the water delivery obligations in the event of shortage from any cause. In this instance the cause allegedly arises from environmental requirements and reclamation needs arising from legislation enacted after the contract. Neither the ESA nor the CVPIA by their terms evidence intent of the United States to willfully injure Movants' property.

Paragraph 11 creates a condition precedent. Nine hundred thousand (900,000) acre-feet must be delivered annually unless a shortage exists. Movants assert that the condition is illusory because the express language of the contract does not enumerate the causes of shortage. "One of the methods of circumventing the illusory promise problem is interpolating into an agreement that otherwise seems illusory the requirement of good faith or reasonableness. A good illustration of this approach is found in the case of *Furrer v. International Health Assurance Co.,* [256 Or. 429, 474 P.2d 759 (1970) ] where a promise 'to spend as he personally sees fit in developing' a business was not held to be illusory under the modern approach. There are now many cases that have employed this technique." John. D. Calamari and Joseph M. Perillo, *The Law of Contracts,* § 4–12 at 228 (1991). *(See also* § 4–12(5) discussing common practice of grafting a best efforts requirement onto sales of real estate contingent upon the purchaser's ability to obtain a specified mortgage loan.) Here, a requirement of reasonableness has been interpolated into the government's promise to deliver the full allotment of water unless shortage lawfully occurs.

Movants allege that Article 11 is unenforceable as it fixes liquidated damages at zero. The concept of liquidated damages

implies the existence of a breach. Article 11 excuses performance upon the occurrence of a condition. Article 11 specifies a limitation on remedies in the event of the occurrence of the condition of a shortage. The effect of Article 11 is that if a shortage occurs, Movants are not entitled to damages because no breach occurs. If the government refuses to deliver water in the absence of a shortage, Movants are not precluded from seeking damages.

### G. *Mandatory Nature of Federal Defendants' Allocation of Water for Environmental Purposes*

Movants argue that the Federal Defendants were not required by the Endangered Species Act and the Central Valley Project Improvement Act to make water allocations for environmental purposes. Congress has mandated both expressly and implicitly that the Bureau make water allocations for environmental concerns. *See, e.g.,* CVPIA at § 3406(d) (requiring water allocations to wildlife refuges); 16 U.S.C. § 1536(a)(2) (requiring federal agencies to "insure that any action authorized, funded, or carried out ... is not likely to jeopardize the continued existence of any ... threatened species....").

The validity of allegedly applicable environmental statutes is challenged, as well as whether the Bureau has *correctly* complied with the environmental statutes. As stated in the memorandum opinion, a motion to enforce a stipulated judgment, which joined only some of the proper defendants and wherein Movants lack procedural standing is not the appropriate means to attack the Bureau's actions:

These remaining arguments concern the Bureau's *method* of compliance with the ESA and the CVPIA, rather than the *necessity* of the Bureau's compliance. In *Alpine Ridge,* the Supreme Court stated,

---

**8.** Movants allege that the damage provision violates UCC § 2719. Section 2719(1) states that an agreement may provide for substitute remedy provisions "as by limiting the buyer's remedies to return of the goods and repayment of the price ..." Movants argue that under § 2719(2), the government cannot enforce the limited remedy provision because its essential purpose has failed. That allegedly lawful, statutorily mandat-

ed use of Project water has occurred does not result in failure of the essential purpose of the remedy provision. *Cf. RRX Industries, Inc. v. Lab–Con, Inc.,* 772 F.2d 543 (9th Cir.1985) (essential purpose of remedy provision which provided that seller would repair software failed where seller unable or unwilling to repair product). Nor is § 2719(3) applicable, as the provision cannot be considered unconscionable.

"If respondents have been denied formula-based rent increases based on shoddy comparisons, *their remedy is to challenge the particular study, not to deny HUD's authority to make comparisons.*" — U.S. at ——, 113 S.Ct. at 1904. The proper forum to raise Movants' remaining issues is a separate suit in which all the necessary parties are named, rather than a motion to enforce the 1986 Judgment. Movants lack procedural standing to challenge the adequacy of the biological opinion, as the present action does not name the National Marine Fisheries Service or the Department of Commerce, nor have the Fisheries Service or the Department of Commerce been provided sixty days notice of Movants' intent to file suit under ESA, as required by 16 U.S.C. § 1540(g).

On May 17, 1993, Westlands filed suit alleging the biological opinion is inadequate and an EIS is required.[9] The Bureau, the National Marine Fisheries Service, and the Secretaries of Commerce and Interior are named as defendants. Proper notice appears to have been provided. While Westlands and its member landowners and water users may have differing interests as to how water is divided within the water district, their interests in obtaining water from the Bureau under the 1963 service contract appear to be identical.[10] No request has been made for consolidation of the Westlands' case with this action.

Any challenges to the Bureau's method of compliance with ESA and CVPIA will undoubtedly involve extremely complex and time-consuming proceedings. Judicial economy is not served by proceeding in separate cases brought by parties with seemingly identical interests.

### III. Conclusions

Movants have not demonstrated the existence of extraordinary circumstances, clear error of law, or manifest injustice which would mandate reconsideration of the order denying the motion to enforce the judgment.

9. Case number CV–F–93–5327–OWW–SSH ("Westlands' case").

Movants' motion is DENIED.

SO ORDERED.

10. If this is not the case, Area I may attempt to intervene in the Westlands litigation.