**Edwin R. O'NEILL, et al.,**
**Plaintiffs–Appellants,**

v.

**UNITED STATES of America,**
**Defendant–Appellee.**

No. 93–17154.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 16, 1994.

Decided March 14, 1995.

William M. Smiland, Donnelly, Clark, Chase & Smiland, Los Angeles, CA, for plaintiffs-appellants.

Robert L. Klarquist, U.S. Dept. of Justice, Environment and Natural Resources Div., Washington DC, for defendant-appellee.

Before CHOY, FARRIS, and BRUNETTI, Circuit Judges.

CHOY, Circuit Judge:

Landowners and water users within "Area I" of the Westlands Water District appeal the district court's denial of their motion to enforce a stipulated judgment which required the United States to perform a 1963 long-term water service contract with the Westlands Water District. The district court held that the contract does not obligate the government to furnish to Westlands the full contractual amount of water when that water cannot be delivered consistently with the requirements of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, and the Central Valley Project Improvement Act ("CVPIA"), Pub.L. No. 102–575, 106 Stat. 4706 *et seq.* The district court further held that Area I could seek judicial review of the agency actions which culminated in the contested water allocation, but that it must do so in a separate suit. We affirm these rulings.

## I.

In 1963, the United States entered into a long-term water service contract with Westlands Water District pursuant to federal reclamation statutes. Under this contract, the United States agreed to construct the San Luis Unit of the Federal Central Valley Project ("CVP") in part to furnish water to the Westlands Water District. The CVP is the country's largest federal water reclamation project. The United States agreed to furnish, and the District agreed to pay for, 900,000 acre-feet of water annually subject to Article 11(a) which limits the government's liability for water shortages caused by "errors in operation, drought, or any other causes." Prior to executing the contract, the

government conducted feasibility studies and the landowners and other interested parties testified before Congress in support of the project.

Until 1978, both parties performed the contract. Except for one year of drought, a minimum of 900,000 acre-feet of water was delivered annually to Area I landowners and water users. Bolstered by the water supply from the San Luis Unit, the landowners were able to expand their farming operations. However, in 1978, the government refused to perform the contract, maintaining that it was invalid. From that year until 1986, the government required the Westlands District to enter into interim contracts which permitted the government to divert water from Area I "for reasons other than dry or critically dry year," for reasons of "water quality control" in the Delta, or "for any environmental . . . reasons." Then, in 1986 the parties stipulated to, and the court entered, a judgment ordering the United States to perform the 1963 contract.

In November of 1990, the Sacramento River winter-run chinook salmon was listed as a threatened species under the Endangered Species Act. 50 C.F.R. § 227.4 (1993). ESA was enacted in 1973 to "halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 184, 98 S.Ct. 2279, 2297, 57 L.Ed.2d 117 (1978). ESA Section 7(a)(2) requires all federal agencies "in consultation with and with the assistance of the Secretary [of the Interior or Commerce, to] insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species. . . ." 16 U.S.C. § 1536(a)(2). Accordingly, when the winter-run chinook salmon was listed as a threatened species, the Bureau of Reclamation ("Bureau") entered into ESA consultation with the National Marine Fisheries Service ("NMFS"). As a result of this consultation, NMFS issued a biological opinion which concluded that the Bureau's continued operation of the CVP in the water year 1992–1993 was likely to jeopardize the continued existence of the salmon population. The opinion noted that jeopardy to the salmon could be avoided if the Bureau operated the CVP in accordance with certain prescribed alternatives.

While the Bureau was developing its initial 1993 CVP water allocation, the United States Fish and Wildlife Service issued a notice of intent to list another species of fish indigenous to the Sacramento–San Joaquin Delta, the delta smelt, as a threatened species. The delta smelt was listed on March 5, 1993. 50 C.F.R. § 17.11 (1993). Consultation and a biological opinion followed with a result analogous to that in the salmon case.

In October 1992, Congress enacted CVPIA, amending the 1937 CVP reauthorization statute. CVPIA seeks to achieve "a reasonable balance among competing demands for use of Central Valley Project water, including the requirements of fish and wildlife, agricultural, municipal and industrial and power contractors." Section 3402(f). Section 3406(b)(2) of the CVPIA directs the Secretary to

> dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife and habitat restoration purposes and measures authorized by this title; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento–San Joaquin Delta Estuary; and to help meet such obligations as may be legally imposed upon the Central Valley Project under State or Federal law following the date of enactment of this title, including but not limited to additional obligations under the Federal Endangered Species Act.

On February 15, 1993, the Bureau announced its initial allocation of CVP water for 1993. Under the final allocation, agricultural contractors south of the Sacramento–San Joaquin Delta, such as the Westlands District, were to receive only 50 percent of their contractual supply of water. Contractors north of the Delta were to receive 100 percent of their supply, as were "exchange contractors" south of the Delta.

On March 26, 1993, Area I filed a motion to enforce the 1986 stipulated judgment. The government argued that compliance with

ESA and CVPIA required it to reduce the amount of water supplied to Area I and that such a reduction was covered by the liability limitation in Article 11 of the contract. The district court agreed with the government that Article 11 limited Area I's contractual rights to delivery of the 900,000 acre-feet of CVP water. The court also held that Area I could seek judicial review of the agency actions which culminated in the 1993 water allocation, but that it must do so in a separate suit. At the time of the district court's decision, the Westlands Water District had already filed such a suit in the same court; Area I has subsequently intervened. *Westlands Water Dist. et al. v. United States et. al.*, 850 F.Supp. 1388 ("Westlands case").[1]

In this appeal, Area I raises the following issues: (1) whether Article 11(a) of the water service contract, which absolves the government of liability for water shortages due to drought or "any other causes," excuses the government from supplying the full contractual amount of water; (2) whether the district court should have considered extrinsic evidence in interpreting the water service contract; (3) whether the government expressly warranted that the contractual amount of water would be available; (4) whether Article 11 is valid and enforceable;

and (5) whether the district court should have decided if environmental statutes did, in fact, mandate the reduction in water delivery to Area I.

## II.

■ This court reviews *de novo* principles of contract interpretation as applied to the facts. *Aetna Casualty and Surety Co. v. Pintlar Corp.*, 948 F.2d 1507, 1511 (9th Cir. 1991). In particular, the determination of whether contract language is ambiguous is a question of law. *Carpenters Pension Trust Fund v. Underground Constr. Co.*, 31 F.3d 776, 778 (9th Cir.1994).

■ Federal law governs the interpretation of contracts entered into pursuant to federal law where the government is a party. *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir.1989).

### A.

■ Article 11(a) of the water service contract provides that the government shall not be held liable for "any damage, direct or indirect, arising from a shortage on account of errors in operation, drought, or any other causes."[2] The government contends this

1. In that case, the district court preliminarily enjoined implementation of two of CVPIA's fish and wildlife provisions, sections 3406(b)(2) and (d)(1), on the ground that implementation of these sections would violate the National Environmental Policy Act, 42 U.S.C. § 4332 (1988). We have vacated the preliminary injunction. *Westlands Water Dist. v. NRDC*, 43 F.3d 457 (9th Cir.1994).

2. Article 11 provides:

UNITED STATES NOT LIABLE FOR WATER SHORTAGE

(a) There may occur at times during any year a shortage in the quantity of water available for furnishing to the District through and by means of the Project, but in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising from a shortage on account of errors in operation, drought, or any other causes. In any year in which there may occur a shortage from any cause, the United States reserves the right to apportion the available water supply among the District and others entitled under the then existing contracts to receive water from the

San Luis Unit in accordance with conclusive determinations of the Contracting Officer as follows:

(i) A determination shall be made of the total quantity of water agreed to be accepted during the respective year under all contracts then in force for the delivery of Central Valley Project water by the United States from the San Luis Unit, the quantity so determined being hereinafter referred to as the contractual commitments;

(ii) A determination shall be made of the total quantity of water from the Central Valley Project which is available for meeting the contractual commitments, the quantity so determined being hereinafter referred to as the available supply;

(iii) The total quantity of water agreed to be accepted by the District during the respective year, under Article 3 hereof, shall be divided by the contractual commitments, the quotient thus obtained being hereinafter referred to as the District's contractual entitlement; and

(iv) The available supply shall be multiplied by the District's contractual entitlement and the result shall be the quantity of water required to be delivered by the United States to

language is broad and unambiguous and that shortages stemming from mandatory compliance with ESA and CVPIA are shortages resulting from "any other cause." Therefore, the government concludes, it is not liable for its failure to deliver the full contractual amount of water to Area I. Area I maintains that the contract language is ambiguous, and limits the government's liability for water delivery only in the event of a "temporary emergency" such as a "rare time[ ] of severe drought." Appellants' Opening Brief at 9.

"A contract is ambiguous if reasonable people could find its terms susceptible to more than one interpretation." *Kennewick,* 880 F.2d at 1032. Area I finds ambiguity where none exists; the terms of Article 11(a) admit of one meaning and are internally consistent. On its face, Article 11(a) unambiguously disclaims any liability for damages in the event the United States is unable to supply water in times of shortage. Clearly captioned "United States Not Liable for Water Shortage," Article 11 explicitly recognizes that "[t]here may occur at times during any year a shortage in the quantity of water available for furnishing to the District" and provides that "in no event shall any liability accrue against the United States ... for any damages ... arising from a shortage on account of errors in operation, drought, *or any other causes.*" (emphasis added). As the district court duly noted, there are no enumerated exceptions to this provision: "Westlands, as the contracting party, did not include any language of limitation in the contract." *Barcellos and Wolfsen, Inc. v. Westlands Water Dist.,* 849 F.Supp. 717, 723 (E.D.Cal.1993).

Area I claims that other provisions of the contract render the language "shortage on account of ... any other causes" ambiguous. It asserts that a provision which grants Westlands an option to renegotiate terms consistent with future amendments in reclamation law creates an ambiguity. Article 26 provides, in relevant part:

In the event that the Congress of the United States ... amends ... provisions of the Federal reclamation laws, the United States agrees, at the option of the District, to negotiate amendments of appropriate articles of this contract, all consistently with the provisions of such ... amendment.

The contract preamble recites that the contract was entered into pursuant to the federal reclamation laws.

Area I contends that because Article 26 and the contract preamble explicitly reference statutes, whereas the phrase "any other causes" does not explicitly include the effects of subsequently enacted statutes, the scope of "any other causes" is ambiguous.

"[A]ny other causes" is a catchall phrase that does not "explicitly" include *any* particular causes. Contrary to Area I's position, the specific reference to reclamation law in Article 26 is not at all inconsistent with the notion that "any other causes" broadly and unambiguously contemplates the effects of subsequent Congressional mandates. Consistently with this court's prior interpretation of identical language, in the event that reclamation law is amended, Article 26 gives the water districts "a choice between renegotiating their contracts to bring them into conformity with the new law or withdrawing from the reclamation program." *Peterson v.*

the District for the respective year, but in no event shall such amount exceed the total quantity of water agreed to be accepted by the District pursuant to Article 3 hereof. Insofar as determined by the Contracting Officer to be practicable, the United States will, in the event a shortage appears probable, notify the District of such determinations in advance of the irrigation season.
(b) In the event that in any year there is delivered to the District by reason of any shortage or apportionment as provided in subdivision (a) of this article or any discontinuance or reduction of service as set forth in subdivision (d) of Article 9 hereof, less than the quantity of

water which the District otherwise would be entitled to receive, there shall be made an adjustment on account of the amounts paid to the United States by the District for water for said year in a manner similar to that provided for in Article 7. To the extent of such deficiency, such adjustment shall constitute the sole remedy of the District or anyone having or claiming to have by, through, or under the District the right to the use of any of the water supply provided for herein.
(c) The United States assumes no responsibility with respect to and does not warrant the quality of the water to be furnished pursuant to this contract....

*United States Dept. of Interior*, 899 F.2d 799, 812 (9th Cir.), *cert. denied*, 498 U.S. 1003, 111 S.Ct. 567, 112 L.Ed.2d 574 (1990). Relieving the government from liability for delivering Westlands' full contractual amount of water where a reduction is mandated by statute, including by amendments to reclamation law, is not incompatible with giving Westlands an option to renegotiate its contract to conform to changes in reclamation law. Article 26 does not, therefore, render ambiguous the scope of "any other causes." [3]

We conclude that the contract's liability limitation is unambiguous and that an unavailability of water resulting from the mandates of valid legislation constitutes a shortage by reason of "any other causes."

### B.

■ The inquiry, however, does not necessarily stop at the four corners of the contract. The district court's opinion asserted, "[t]he terms at issue are not defined in the contract but they are clear on their face. . . . There is no need to examine extrinsic evidence as to the parties' intended meaning." 849 F.Supp. at 723. To the extent the district court's opinion could be read to hold extrinsic evidence is inadmissible to interpret the terms of a facially unambiguous written instrument, the opinion misstates the law. To the contrary, under the Uniform Commercial Code extrinsic evidence of usage of trade, course of dealing and course of performance may be considered in determining whether a contract is ambiguous. U.C.C. § 2–202.

■ The Uniform Commercial Code is a source of federal common law and may be relied upon in interpreting a contract to which the federal government is a party. *Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*, 730 F.2d 186, 189 (5th Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 515, 83 L.Ed.2d 405 (1984). The Code permits the use of extrinsic evidence in a manner that substantially narrows the traditional application of the parol evidence rule. U.C.C. Section 2–202 provides:

> Terms . . . which are . . . set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
>
> > (a) by course of dealing or usage of trade (Section 1–205) or by course of performance (Section 2–208); and
> >
> > (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

As the Official Comment states, "[t]his section definitely rejects . . . [t]he requirement that a condition precedent to the admissibility of the type of evidence specified in paragraph (a) is an original determination by the court that the language used is ambiguous." U.C.C. § 2–202, Comment § 1(c). Consistently with this interpretation, this court has observed that "[t]he Code lets in evidence of prior dealings, usage, and performance under 2–202(a) *even if* the contract terms are clear." *Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772, 783 n. 16 (9th Cir.1981); *see also Bloom v. Hearst Entertainment, Inc.*, 33 F.3d 518, 523 (5th Cir. 1994); *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 9 (4th Cir.1971).

The government fails to support its contention that extrinsic evidence may not be considered in determining whether a contract is ambiguous. It cites *Wilson Arlington Co. v. Prudential Ins. Co.*, 912 F.2d 366 (9th Cir. 1990), a case which may readily be distin-

---

3. Area I also argues that, properly interpreted, sufficient water was "available" to serve all CVP contractors their full entitlements under the contract. Consequently, it maintains, there was no "shortage" which would absolve the United States of liability under Article 11. This argument must be rejected, as it is fundamentally a restatement of the contention that the government may not deny Area I its full contractual allotment unless water is not available because of a rare emergency, such as drought. As we have concluded, such an interpretation of the term "shortage" impermissibly ignores the clear language of the contract which limits the government's liability when there is a shortage in the amount of water available for delivery to Westlands "on account of . . . drought . . . or any other causes."

guished. In *Wilson Arlington,* this court was applying Virginia common law which, in contrast to the U.C.C., strictly adheres to the parol evidence rule. *Id.* at 371.[4] *Pavlik v. Consolidation Coal Co.,* 456 F.2d 378 (6th Cir.1972), similarly fails to advance the government's argument, as that case applies Ohio common law principles of contract interpretation.

■ Nevertheless, we affirm the district court's refusal to consider the extrinsic evidence proffered by Area I as it is not the kind of evidence that U.C.C. Section 2–202 renders admissible. Area I points to government statements in news releases and feasibility reports as evidencing intent contrary to the language of the contract, and seeks to establish that subsequent to signing the contract certain Westlands landowners subjectively believed that Article 11's liability limitation could only be triggered by drought. This evidence is not relevant to usage of trade, which is defined in U.C.C. Section 1–205(2) as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." Nor does this evidence purport to establish a course of dealing, defined as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." U.C.C. § 1–205(1). Nor is this evidence relevant to establishing a "course of performance accepted or acquiesced in without objection." U.C.C. § 2–208.

### C.

■ Area I argues that Article 11(a)'s liability limitation is inoperative because the government expressly warranted that water would be available to fulfill the contract. Area I contends that statements of "high government officials," including former President John F. Kennedy, created such an express warranty. We decline, however, to consider these statements. Although the U.C.C. permits extrinsic evidence to be considered in determining whether a contract is ambiguous, once a contract is found to be unambiguous the parol evidence rule excludes statements offered to contradict a clear contract term in a final[5] expression of agreement. U.C.C. § 2–202; *Pierce County Hotel Employees & Restaurant Employees Health Trust v. Elks Lodge, B.P.O.E., No. 1450,* 827 F.2d 1324, 1327 (9th Cir.1987). An express warranty of availability would contradict Article 11's unambiguous disclaimer of liability for shortages in water available for supply to Westlands. *See* 1 J. White & R. Summers, Uniform Commercial Code, § 12–4, at 568 n. 2 (3rd ed. 1988) ("If ... the writing that includes a disclaimer is intended to be final, most courts hold that parol warranties are 'contradictory' within 2–202 and hence inadmissible.").

■ Even if the remarks of "high government officials" were admissible to contradict the clear terms of the contract, they would not amount to an express warranty. U.C.C. Section 2–313(1) defines an express warranty as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise

(b) Any description of the goods which is made part of the basis of the bargain. ...

The first presidential statement Area I cites is merely congratulatory: "I believe that all Californians' [sic] will remember the leadership which your distinguished Governor has

---

4. In cases where the U.C.C., as adopted by Virginia, applies, the outcome has been to the contrary. In *Columbia Nitrogen Corp.,* for example, the Fourth Circuit applied U.C.C. Section 2–202 as adopted by Virginia and held that "a finding of ambiguity is not necessary for the admission of extrinsic evidence about the usage of the trade and the parties' course of dealing." 451 F.2d at 9.

5. Although the district court does not explicitly find that the contract was intended to be final, Area I does not argue to the contrary. The fact that the contract was approved by the President, Congress, and all of the landowners in Westlands Water District indicates the finality of the agreement.

given to this great cause of making water available to the people of this State." Excerpts from John F. Kennedy's Remarks at Ground Breaking Ceremonies at the San Luis Dam (Aug. 18, 1962). The President also stated "[w]ater will be made available to 350,000 acres." Remarks at the White House approving the 1963 Service Contract (Jan. 28, 1963). These statements cannot reasonably be considered a guarantee that the full contracted amount of water would always be available.

The other statements of government officials cited by Area I are predictions and opinions. For example, Mr. Harvey O. Banks, Director of the California Department of Water Resources, testified before Congress: "It is my opinion that there does in fact exist ... surplus water sufficient to serve both of these projects." Transcript of Hearings before the Subcommittee on Irrigation and Reclamation of the Committee on Interior and Insular Affairs, House of Representatives (Jan. 15–17, 1958). Congratulatory political statements and opinions by government officials do not amount to an "affirmation" of a guaranteed availability of water which could reasonably be considered the "basis of the bargain."

■ Area I also points to explanatory recitals in the 1963 contract as creating an express warranty of availability. The preamble relates that there will be available for furnishing to Westlands an additional water supply from the San Luis Unit. The district court correctly concluded that these recitals do not amount to a warranty of availability. The cases on which Area I relies highlight the weakness of its argument. *See, e.g., Gulf Oil Corp. v. Fed. Power Comm'n,* 563 F.2d 588 (3rd Cir.1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978). In *Gulf Oil,* the Third Circuit found that the seller had warranted the availability of gas and therefore "assumed for itself the entire risk that future conditions would raise the cost of gas." *Id.* at 599. In contrast to the contract at hand, the Gulf Oil contract contained an explicit provision warranting availability of gas for delivery: "Seller ... warrants and agrees that there will be provided ... a quantity of gas sufficient to enable

Seller to have available for delivery ... a volume not less than [a certain amount]...." *Id.* at 594. The 1963 water service contract explicitly and unambiguously limits the liability of the government for water shortages, without exception. The statements cited by Area I do not alter this conclusion.

## D.

■ Even if the water service contract did obligate the government to supply, without exception, 900,000 acre-feet of water, the district court correctly held that Area I would still not be entitled to prevail as the contract is not immune from subsequently enacted statutes. 849 F.Supp. at 730. The Supreme Court has held that Congress's power to exercise sovereign authority " 'will remain intact unless surrendered in unmistakable terms.' " *Bowen v. Public Agencies Opposed to Social Sec. Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 2397, 91 L.Ed.2d 35 (1986) (quoting *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982)). "[C]ontractual arrangements, including those to which a sovereign itself is party, 'remain subject to subsequent legislation' by the sovereign." *Id.* (quoting *Merrion,* 455 U.S. at 147, 102 S.Ct. at 907). Nothing in the 1963 contract surrenders in "unmistakable terms" Congress's sovereign power to enact legislation. Rather, the contract was executed pursuant to the 1902 Reclamation Act and all acts amendatory or supplementary thereto. 1963 Contract Preamble. *See Madera Irr. Dist. v. Hancock,* 985 F.2d 1397, 1407 (9th Cir.) (Hall, J., concurring), *cert. denied,* ⸺ U.S. ⸺, 114 S.Ct. 59, 126 L.Ed.2d 29 (1993). The contract contemplates future changes in reclamation laws in Article 26, and Article 11 limits the government's liability for shortages due to any causes. As Area I recognized in its oral argument, CVPIA marks a shift in reclamation law modifying the priority of water uses. There is nothing in the contract that precludes such a shift.

## E.

Area I argues that Article 11 as interpreted by the district court is unenforceable on

five grounds. None of these grounds is tenable.

Area I first asserts that Article 11 as interpreted is inoperative, as it would unreasonably negate the government's express warranty of availability. Our finding that no express warranty of availability exists disposes of this argument.

 Area I then argues that the district court's interpretation of Article 11 would deny Westlands landowners any damages for their losses and would therefore constitute an unenforceable liquidated damages clause. As the district court concluded, however, Article 11 does not contain a liquidated damages clause. Article 11 operates such that, where, as here, a water shortage prevents the government from delivering the entire contractual amount of water, the government is excused from full performance and no breach therefore occurs.

 Relying on U.C.C. Section 2–719(2), as adopted by California, Area I next maintains that the essential purpose of Article 11's remedy provision has failed and that the provision is therefore unenforceable. That section provides, "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act." As the district court held, "[t]here is no evidence that the essential purpose of the remedy provision has failed." 849 F.Supp. at 723 n. 10. U.C.C. Section 2–719(2) " 'becomes operative when a party is deprived of its contractual remedy....' " *Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.*, 617 F.2d 936, 941 (2nd Cir.1980) (quoting *Soo Line R.R. Co. v. Fruehauf Corp.*, 547 F.2d 1365, 1371 n. 7 (8th Cir.1977)). Here, the contractual remedy provided for in the contract is a reduction in the price paid for water deliveries. There is no evidence that Area I has been deprived of this remedy.

 Nor is Article 11 unconscionable. The district court correctly found that the water service contract was the product of bargaining by sophisticated parties who foresaw that circumstances might limit the government's ability to deliver the contracted quantity of water in the future. "Where two equal bargainers ... agree as to the appropriate remedy ... they should be held to the terms of their bargain." *Id.* Area I has not established that there has been a cost or allocation of risk "which is overly harsh and was not justified by the circumstances under which the contract was made." *Carboni v. Arrospide*, 2 Cal.App.4th 76, 83, 2 Cal. Rptr.2d 845, 849 (1991). Area I points out that Article 11 is a "standard" provision which appeared in other water service contracts. It does not, however, assert that the government refused to bargain over this term. *See id.* at 85–86, 2 Cal.Rptr.2d at 850–51. The mere fact that a provision is standard does not render it unconscionable.

 Finally, Area I claims that Article 11 is void as against the policy of the law because it would exempt the government from responsibility for willful injury to Area I landowners' property. Following the statutory mandates of ESA and CVPIA can hardly be said to be an effort to willfully injure the landowners' property.

Consequently, the unambiguous language of Article 11(a) is enforceable.

### III.

 Although Judge Wanger interpreted the water service contract, he declined to evaluate the merits of the Bureau's compliance with ESA and CVPIA, holding "a motion to enforce a stipulated judgment, which joined only some of the proper defendants and wherein Movants lack procedural standing is not the appropriate means to attack the Bureau's actions." 849 F.Supp. at 733. Because the district courts are entitled to discretion in managing cases within the federal system, we review this decision for an abuse of discretion:

Wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation, does not counsel rigid mechanical solution of such problems.... Necessarily, an ample degree of discretion, appropriate for disciplined and experienced judges, must be left to the lower courts.

*Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.,* 342 U.S. 180, 183–84, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952).[6]

■ Where the question of abstention arises among federal courts, judicial economy is a primary consideration: "As between federal district courts ... though no precise rule has evolved, the general principle is to avoid duplicative litigation." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976); *see Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1204 (2nd Cir.1970) ("[A] district judge has considerable latitude in these matters").

■ In propounding that abstention must be permitted only in "exceptional" circumstances, Area I draws from *Colorado River* abstention cases in which a federal court declines to decide a case in favor of similar litigation pending before a state court. *See, e.g., American Int'l Underwriters (Philippines), Inc. v. Continental Ins. Co.,* 843 F.2d 1253 (9th Cir.1988). Such a refusal to exercise jurisdiction is considered to be beyond the demands of federalism that are at the heart of abstention doctrine and thus it " 'can be justified ... only in ... exceptional circumstances.' " *Colorado River,* 424 U.S. at 813, 96 S.Ct. at 1244 (quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959)); *see generally* Charles A.

Wright, Law of Federal Courts § 52, at 336–37 (5th ed. 1994). In contrast to the *Colorado River* type of abstention, at issue here is the propriety of a *federal district court* declining to decide an issue which will be decided in a parallel *federal district court* proceeding. Area I's reference to *Colorado River* abstention cases is therefore inapt.

■ Judge Wanger held that Area I lacked procedural standing to challenge the adequacy of the biological opinion, as the present action did not name the National Marine Fisheries Service or the Department of Commerce. And neither of these potential defendants was provided the sixty days notice of intent to file suit under ESA, as is required by 16 U.S.C. § 1540(g). Consequently, he concluded the forum was inappropriate. On the other hand, the Westlands, San Benito County, San Luis, and Panoche Water Districts had filed suit in the same court challenging the Bureau's method of compliance with ESA and CVPIA. In that case, the proper parties were named as defendants. *Westlands Water Dist. et al. v. United States et al.,* 850 F.Supp. 1388. The Westlands case is also before Judge Wanger. Judge Wanger properly determined that the Westlands case would adequately address Area I's challenge to the Bureau's water allocations and it would thus be "judicially inefficient to have two parallel cases proceed-

**6.** Area I contends this court should review *de novo* the district court's decision to abstain from resolving the statutory issues. For this proposition, Area I cites *Gartrell Constr. Inc. v. Aubry,* 940 F.2d 437, 441 (9th Cir.1991). This reliance is misplaced. *Gartrell* applied the abstention doctrine of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *Id.* at 441. The *Younger* abstention doctrine is not at issue here, and commands a different standard of review. *Younger,* like the other established abstention doctrines, is inapplicable to this case, as those doctrines govern circumstances involving the exercise of concurrent jurisdiction by state and federal courts. As is discussed above, district courts are given deference in managing cases within the federal system.

In general, the Supreme Court has recognized the following categories of circumstances appropriate for abstention:

 Abstention is appropriate "in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a

state court determination of pertinent state law" [Pullman abstention]....

 ... where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result of the case then at bar [Burford abstention]....

 ... where, absent bad faith, harassment, or a patently invalid state statute, federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings [Younger abstention].

*Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 814–16, 96 S.Ct. 1236, 1244–45, 47 L.Ed.2d 483 (1976) (citations omitted). In *Colorado River,* the Supreme Court recognized a fourth limited category of abstention to serve the convenience of the federal courts where a federal action could be dismissed in favor of a pending state action. *Id.* at 817–19, 96 S.Ct. at 1246–47. None of these types of abstention is relevant here.

ing simultaneously." 849 F.Supp. at 729.[7] This inefficiency is heightened by the fact that "challenges to the Bureau's method of compliance with ESA and CVPIA will undoubtedly involve extremely complex and time-consuming proceedings." *Id.*

Under the circumstances, it was within the district court's discretion to decline to evaluate the compliance issue; to do otherwise would be both inefficient and unnecessary. Moreover, such a decision will enable a comprehensive judicial resolution of the allocation problem which affects many parties other than Area I.

## IV.

In conclusion, the district court correctly interpreted the water service agreement between the United States and the Westlands Water District. Article 11(a) unambiguously absolves the government from liability for its failure to deliver the full contractual amount of water where there is a shortage caused by statutory mandate. Area I's challenge to the Bureau's compliance with ESA and CVPIA will be resolved in the separate proceeding in the Westlands case.

AFFIRMED.

---

**7.** Indeed, since the district court's ruling, Area I has intervened in the Westlands litigation where it is presently challenging the Bureau's application of ESA and CVPIA. In particular, Area I argues the following: that the government's actions in allocating CVP water were arbitrary, capricious and/or contrary to law; that the reductions implemented in the 1993 water year were not mandated by statute; that the dedication of the 800,000 acre feet of CVP yield for fish and wildlife purposes was not mandated, was not done in compliance with, and was a violation of the CVPIA; and that the 225,000 acre feet reduction for salmon protection under ESA was not mandated, or done in compliance with, and was a violation of the ESA. *See Westlands Water Dist. v. United States,* 850 F.Supp. 1388, 1397–98 (E.D.Cal.1994) (motion to dismiss water districts' complaints).