**WESTLANDS WATER DISTRICT; San Benito Water District, Plaintiffs–Appellants,**

v.

**UNITED STATES of America; Department of Interior; Bureau of Reclamation, United States Department of Interior; Kirk C. Rodgers, Acting Regional Director; Gale A. Norton, Secretary of the Interior, Defendants–Appellees,**

San Joaquin River Exchange Contractors Water Authority; Friant Power Authority; Friant Water Users Authority; Chowchilla Water District; Madera Irrigation, Defendant–Intervenors–Appellees,

v.

Roger K. Patterson, Regional Director of Mid Pacific Region; Bruce Babbitt, Secretary of the Interior; Lester Snow, Acting Regional Director, Defendants.

No. 01–16987.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 2002.

Filed July 31, 2003.

William T. Chisum and Daniel J. O'Hanlon, Kronick, Moskovitz, Tiedemann & Girard, and Thomas W. Birmingham for plaintiffs-appellants Westlands Water District and San Benito Water District.

Todd Aagaard for defendant-appellee United States of Amer ica.

Maria A. Iizuka for defendants-appellees Bureau of Reclama tion, Department of the Interior, and Secretary of the Interior.

Michael V. Sexton, Minasian, Spruance, Baber, Meith, Soares, & Sexton, for defendant-intervenors San Joaquin River Exchange Contractors Water Authority and Friant Power Authority.

Gregory K. Wilkinson, Best, Best, & Krieger, for defendantintervenor Friant Water Users Authority.

Michael A. Campos, Washburn, Briscoe, & McCarthy, for defendant-intervenor, Madera Irrigation District.

Denslow Green, Green, Green & Rigby, for defendant–intervenor, Chowchilla Water District.

Before B. FLETCHER, RAWLINSON, and CLIFTON, Circuit Judges.

## OPINION

BETTY B. FLETCHER, Circuit Judge.

This action arises out of water allocations during water year 1994 in the San Luis Unit of the Central Valley Project, a federal water management project. Plaintiffs-appellants Westlands Water District ("Westlands") and San Benito County Water District ("San Benito") appeal the district court's order granting summary judgment in favor of defendants and defendant-intervenors concerning the United States Department of the Interior Bureau of Reclamation's allocation of Central Valley Project water during periods of shortage. Plaintiffs-appellants allege that granting priority to a group of contrac-

tors, intervenor-defendants San Joaquin River Exchange Contractors ("Exchange Contractors"), violated contracts between the water districts and the United States. Plaintiffs–Appellants seek injunctive and declaratory relief to prohibit distribution of water in contravention of their contracts. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## BACKGROUND

### I. Factual Summary

#### A. Central Valley Project

The Central Valley Project ("CVP") is "the largest federal water management project in the United States." *Central Delta Water Agency v. United States*, 306 F.3d 938, 943 (9th Cir.2002). "[L]ocated in the Central Valley Basin of California, which is roughly 400 miles long by 120 miles wide, [it] includes the major watersheds of the Sacramento and San Joaquin river systems."[1] *Id.* These two river valleys merge at the Sacramento San Joaquin Delta, where the waters mix and then flow through the Carquinez Strait into the San Francisco Bay, continuing to the Pacific Ocean. *Id.; United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 728, 70 S.Ct. 955,

94 L.Ed. 1231 (1950). The Sacramento River has almost twice as much water as the San Joaquin River but the Sacramento Valley has very little tillable soil, while about "three-fifths of the [San Joaquin] valley lies in the domain of the less affluent San Joaquin." *Gerlach Live Stock*, 339 U.S. at 728, 70 S.Ct. 955; *see also Dugan v. Rank*, 372 U.S. 609, 612, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). To alter this imbalance and to make water available to the San Joaquin Valley, the state of California embarked on re-engineering its natural water distribution through the authorization of the Central Valley Project ("CVP").[2] United States took over administration of this project in 1935.[3] *Gerlach Live Stock*, 339 U.S. at 728, 70 S.Ct. 955.

The CVP's purpose is to "improv[e] navigation, regulat[e] the flow of the San Joaquin River and the Sacramento River, control[ ] floods, provid[e] for storage and for the delivery of the stored waters thereof, for the reclamation of arid and semiarid lands and lands of Indian reservations, and other beneficial uses, and for the generation and sale of electric energy." Act of August 26, 1937, Pub.L. No. 75 392, 50 Stat. 844, 850. To accomplish the project's purposes, CVP's construction includes a

---

**1.** The Sacramento Valley containing the Sacramento River is located in the northern portion of the Central Valley, while the southern half of the valley is comprised of the San Joaquin Valley containing the San Joaquin River. The Sacramento River begins in the extreme north of the Central Valley, runs southward past Sacramento and then through the Sacramento–San Joaquin Delta into the San Francisco Bay. The San Joaquin River begins in the Sierra Nevada Mountains northeast of Fresno, runs westward to Mendota, and then runs northwestward to the Sacramento–San Joaquin Delta. *See generally Dugan v. Rank*, 372 U.S. 609, 612, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963).

**2.** In 1933, the California Legislature authorized construction of a system of works designated as the Central Valley Project and cre-

ation of the Water Project Authority. (1933 Cal. Stat. 1042); *Wolfsen v. United States*, 142 Ct.Cl. 383, 389–90, 162 F.Supp. 403 (1958).

**3.** The CVP was taken over and executed by the United States under the Reclamation Act of 1902, as amended, Pub.L. No. 57–161, 32 Stat. 388. Congress initially authorized funds for the CVP under the Emergency Relief Appropriations Act of 1935, 49 Stat. 115, § 4 (1935) and the First Deficiency Appropriation Act, fiscal year 1936, Pub.L. No. 74–739, 49 Stat. 1597, 1622. Congress reauthorized the CVP under the Rivers and Harbors Act of 1937, Pub.L. No. 75–392, 50 Stat. 844, 850 (1937), and assigned the Bureau of Reclamation the task of undertaking the construction and operation of the CVP, *see Dugan v. Rank*, 372 U.S. at 611, 83 S.Ct. 999.

series of many dams, reservoirs, hydro-power generating stations, canals, electrical transmission lines, and other infrastructure. *Gerlach Live Stock,* 339 U.S. at 733, 70 S.Ct. 955.

The United States Bureau of Reclamation ("Bureau"), a division of the Department of the Interior, operates the CVP. The California State Water Resources Control Board grants permits for water appropriation from the CVP. The Bureau appropriates water from various sources and delivers it to permit holders for beneficial uses. *Central Delta Water,* 306 F.3d at 943.

### 1. San Luis Unit of the CVP

The San Luis Unit, one of the many water management units of the CVP, was authorized by the San Luis Act of 1960. Pub.L. No. 86–488, 74 Stat. 156 (June 3, 1960). The San Luis Unit, an integral part of the CVP, consists of the San Luis Dam and the San Luis Reservoir. The San Luis Reservoir was constructed to provide water to Merced, Fresno and King Counties, and is used to store surplus water from the Sacramento–San Joaquin Delta, for delivery to contractors such as Westlands and San Benito. The Tracy Pumping Plant pumps water from the Sacramento–San Joaquin Delta into the Delta–Mendota Canal. The Delta–Mendota Canal, located south of the Sacramento–San Joaquin Delta, channels water along the west side of the San Joaquin Valley for use in the San Luis Unit and Reservoir. *Westlands Water Dist. v. Patterson,* 864 F.Supp. 1536, 1539 (E.D.Cal.1994) (*Westlands III* ).

### 2. Friant Unit of the CVP

Around 1939, the Bureau took over construction of a dam on the San Joaquin River that eventually created Lake Millerton and the Friant Unit of the Central Valley Project.[4] *See Gerlach Live Stock Co.,* 339 U.S. at 728–29, 70 S.Ct. 955; *Westlands III,* 864 F.Supp. at 1539. The Friant Unit impounds the waters of the San Joaquin River at a dam constructed at Friant, California, approximately sixty miles upstream from Mendota, diverting a major portion of the flow of the San Joaquin River both to storage in Millerton Lake and into the Friant–Kern and Madera Canals for delivery to local water users. *Dugan,* 372 U.S. at 612–13, 83 S.Ct. 999. The CVP also diverts water from the Sacramento River into the San Joaquin Valley to make additional water available for use in the San Joaquin Valley.

### B. Exchange Contractors

To fulfill the purposes of the Rivers and Harbors Act of 1937, the Secretary of the Interior was given the right to acquire water rights for the development of the CVP. Act of August 26, 1937, Pub.L. No. 75–392, 50 Stat. 844, 850. The Exchange Contractors [5] hold both pre–1914 riparian and appropriative rights to the San Joaquin River. Cal. State Water Rights Bd. Dec. D–935, 80 (1959). The district court noted that the cooperation of the Exchange Contractors made possible the expansion of the CVP and the San Luis Unit. *Westlands Water Dist. v. United States,* 153 F.Supp.2d 1133, 1146–47 (E.D.Cal. 2001) (*Westlands VI* ).[6] To provide a reli-

---

4. The Friant Dam was completed in 1942. *See Westlands III,* 864 F.Supp. at 1539.

5. The Exchange Contractors include Central California Irrigation District, Columbia Canal Company, San Luis Canal Company, and Firebaugh Canal Company. Miller and Lux, predecessors to the Exchange Contractors,

held the water rights to the natural flow in the upper reaches of the San Joaquin River.

6. The San Luis Act of 1960 provided that "[c]onstruction of the San Luis Unit shall not be commenced until the Secretary of the Interior secures all rights to the use of water which are necessary to carry out the purposes

able source of water for its proposed canals, the Bureau had to assure that the Exchange Contractors' pre-existing rights would be satisfied. *Westlands III,* 864 F.Supp. at 1539.

In 1939, the Exchange Contractors entered into two contracts with the United States: a Purchase Contract and an Exchange Contract. "Under the Purchase Contract, the Exchange Contractors sold all [of] their San Joaquin River water rights to the United States, except for 'reserved water,' water to which the Exchange Contractors [hold ] vested rights. Simultaneously, under the Exchange Contract, the Exchange Contractors agreed not to exercise their [reserved water] rights" to the San Joaquin River, so long as they receive certain volumes of substitute water.[7] *Id.*

Pursuant to the Exchange Contract, the exchange of water is a conditional permanent substitution of water supply. The United States has a right to use the Exchange Contractors' water rights "so long as, and only so long as, the United States does deliver to the Contracting Entities by means of the Project or otherwise substitute water in conformity with this contract." The Exchange Contract defines "substitute water" as "all water delivered ... regardless of source." The contract further provides that "[i]t is anticipated that most if not all of the substitute water provided the [Exchange Contractors ] hereunder will be delivered to them via the [ ] Delta–Mendota Canal."

Water allocation in any year is designated as a full year supply of 100 percent. In critical years, the water supply can be reduced by approximately twenty-five percent. If there exists a temporary inter-

ruption of waters from the Delta–Mendota Canal, the contract provides that the United States will deliver water stored in Millerton Lake behind the Friant Dam.

## C. Westlands and San Benito Water Districts

San Benito and Westlands purchase CVP water from the Bureau pursuant to water service contracts.

Westlands is a California water district located within Fresno and King Counties. In 1963, Westlands entered into a contract with the Bureau for water from the San Luis Unit of the CVP, which diverts water from the Sacramento–San Joaquin River Delta via the Delta–Mendota Canal. Westlands is the largest contractor for water from the San Luis Unit, *Firebaugh Canal Co. v. United States,* 203 F.3d 568, 572 (9th Cir.2000), with a contractual entitlement to purchase 900,000 acre feet of water annually, *O'Neill v. United States,* 50 F.3d 677, 680 (9th Cir.1995). Pursuant to Article 11(a) of the Westlands contract, this entitlement is limited during times of water shortage:

There may occur at times during any year a shortage in the quantity of water available for furnishing to the District through and by means of the Project, but in no event shall any liability accrue against the United States ... for any damage ... arising from a shortage on account of errors in operation, drought, or any other causes. In any year in which there may occur a shortage from any cause, the United States reserves the right to apportion the available water supply among the District and others entitled under the then existing con-

of the unit and the terms and conditions of this Act." Pub.L. No. 86–488, 74 Stat. 156.

7. The "reserved waters" include water used for the irrigation of lands (and other pur-

poses) located downstream from the Friant Dam in Fresno, Merced, Madera, and Stanislaus Counties.

tracts to receive water from the San Luis Unit in accordance with conclusive determinations of the Contracting Officer as follows:

(i) A determination shall be made of the total quantity of water agreed to be accepted during the respective year under all contracts then in force for the delivery of Central Valley Project water by the United States from the San Luis Unit, the quantity so determined being hereinafter referred to as the contractual commitments;

(ii) A determination shall be made of the total quantity of water from the Central Valley Project which is available for meeting the contractual commitments, the quantity so determined being hereinafter referred to as the available supply;

(iii) The total quantity of water agreed to be accepted by the District during the respective year, under Article 3 hereof, shall be divided by the contractual commitments, the quotient thus obtained being hereinafter referred to as the District's contractual entitlements; and

(iv) The available supply shall be multiplied by the District's contractual entitlement and the result shall be the quantity of water required to be delivered by the United States to the District for the respective year....

Westlands Contract, art. 11(a).

San Benito is a California water district that administers water distribution and consumption within areas of San Benito County. In 1978, San Benito entered into a contract with the Bureau for Water Service and for Operation and Maintenance of Certain Works of the San Felipe Division of the San Luis Unit pursuant to federal reclamation laws. Article 7(b) of the San Benito contract also includes provisions for water allocations during times of shortage:

In any year that the Contracting Officer determines there is a shortage in the quantity of water available to customers of the United States from the Project, the Contracting Officer will apportion available water among the water users capable of receiving water from the same Project facilities by reducing deliveries to all such water users by the same percentage, unless he is prohibited by existing contracts, Project authorizations, or he determines that some other method of apportionment is required to prevent undue hardship.

San Benito Contract, art. 7(b).

### D. 1994 Water Year Allocations

In February 1994, the Regional Director for the Bureau announced annual CVP water allocations for the 1994 water year (March 1, 1994 to February 28, 1995). Appellants Westlands and San Benito were granted 35% of their contractual entitlement—a percentage of the "available supply"—and the Exchange Contractors were granted 75% of their contractual entitlement—a critical supply.[8] *See Westlands III*, 864 F.Supp. at 1537. Due to the 1994 water year shortage, the Exchange Contractors were provided with additional water from the San Luis Reservoir.

## II. Procedural History

Appellants previously challenged the Bureau's allocation of water for water years 1992 and 1993. *See Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667 (9th Cir.1993) (*Westlands I* ) (affirming the district court decision that the Bureau did not act arbitrarily and capriciously in its 1992 water allocation decisions); *Westlands Water Dist. v. United States*, 850 F.Supp. 1388 (E.D.Cal.1994).

---

**8.** Actually, during the 1994 water year, Westlands received 42.5% of its contractual allocation; and the Exchange Contractors received 100% of their full contractual allocation. *See Westlands III*, 864 F.Supp. at 1537.

In *Westlands I*, we rejected the appellants' interpretation of their contracts with the Bureau. 10 F.3d at 676. We stated, however, that the appellants "should not be foreclosed from arguing in a future suit that the Bureau has violated its contractual obligations to apportion water as required by the Westlands and San Benito contracts." *Id.* at 677 n. 8.

Westlands and San Benito filed a complaint with the district court in March 1994 against the United States of America, Department of Interior, Bureau of Reclamation, Regional Director of the Mid–Pacific Region of the Bureau of Reclamation, and the Secretary of the Interior (collectively "Federal Defendants"), seeking declaratory and injunctive relief against the enforcement of the Bureau's water allocations.[9]

Appellants allege violations of their water service contracts with the United States and request the court to reapportion water allocations, subject to prohibitions in existing contracts. Defendants-in-intervention, the Exchange Contractors, the Friant Power Authority, certain members of the Friant Water Users Association, the Chowchilla Water District, and the Madera Irrigation District join the Federal Defendants in opposing the relief sought by appellants.

Appellants' motion for a preliminary injunction to enjoin the 1994 water allocation decisions and to compel "equal apportionment" was denied by the district court. *Westlands III*, 864 F.Supp. 1536. During the course of this litigation, appellants filed a motion to dismiss its suit without prejudice; appellee United States filed a motion for summary judgment. The district court denied appellants' motion to dismiss, but granted appellee's motion for summary judgment. *Westlands Water District v. Patterson*, 900 F.Supp. 1304 (E.D.Cal. 1995) (*Westlands IV*). On appeal, we reversed the district court's grant of summary judgment to appellee United States and reversed the denial of appellant water district's motion to dismiss its suit against appellee because the suit should have been dismissed without prejudice. *Westlands Water Dist. v. United States*, 100 F.3d 94 (9th Cir.1996) (*Westlands V*).

In July 1997, the district court issued an order conditioning voluntary dismissal on appellants' payment of attorneys' fees and costs to intervenors. Appellants elected not to pay the attorneys' fees and costs and instead, elected to proceed on the merits. *Westlands VI*, 153 F.Supp.2d at 1141. The parties filed cross-motions for summary judgment, and the district court granted defendants' and defendant-intervenors' motions with respect to all of plaintiffs' claims. The district court held that the plaintiffs' water service contracts did not prevent the Bureau from satisfying its obligations to senior water rights holders before allocating water under its water service contracts. Westlands and San Benito appeal alleging that the Bureau's allocation of water in 1994 violated the terms of their water service contracts.

## STANDARD OF REVIEW

We review a grant of summary judgment *de novo*. *See Oliver v. Keller*, 289

9. Appellants request the court to grant three claims of relief: (1) injunctive relief, based on the allegation that the Bureau's 1994 allocations are contrary to the provisions of the appellants' water service contracts, and appellants have no plain, speedy and adequate remedy at law; (2) declaratory relief, based on Article 11 of the Westlands Contract, which obligates the Bureau to apportion water among those entitled to receive water from the San Luis Unit; and (3) declaratory relief, based on Article 7(b) of the San Benito Contract, which obligates the Bureau to apportion available water among water users, subject to prohibitions in existing contracts, CVP authorizations or a determination that some other method of apportionment is required to prevent undue hardship.

F.3d 623, 626 (9th Cir.2002). If genuine issues of material fact exist, summary judgment is not proper. *Meade v. Cedarapids, Inc.,* 164 F.3d 1218, 1221 (9th Cir. 1999). "The court reviews *de novo* principles of contract interpretation as applied to the facts. In particular, the determination of whether contract language is ambiguous is a question of law." *O'Neill,* 50 F.3d at 682 (citations omitted).

## DISCUSSION

One of the most contentious issues in the western United States is the management of water resources. *Central Delta Water,* 306 F.3d at 943. This case involves contract interpretations involving a precious resource, CVP water. Three contracts are involved: the 1939 Exchange Contract, the 1963 Westlands water service contract, and the 1978 San Benito water service contract. Appellants allege that the district court erred in granting summary judgment, raising seven issues concerning the district court's interpretation of their water service contracts. In sum, the issues address whether the water service contracts, under which Westlands and San Benito purchase irrigation water from the Bureau, prevent the Bureau from excluding water owed to senior water rights holders from supplies subject to pro-rata apportionment under the contracts during periods of water shortage. Since we affirm the district court's determination that the Exchange Contractors' prior rights are not subject to the pro-rata distributions included in the Westlands and San Benito water service contracts, we do not reach the other issues raised on appeal.

### A. Equitable Estoppel

■ We stated in *Westlands I* that appellants "should not be foreclosed from arguing in a future suit that the Bureau has violated its contractual obligations to apportion water as required by the West-

lands and San Benito contracts." 10 F.3d at 677 n. 8. The district court concluded that "[appellants] are equitably estopped by their knowledge and conduct to claim otherwise in derogation of a long-standing course of dealing by which Interior has recognized the contractual priority of the Exchange Contractors' vested water rights to substitute water, which it has supplied from Sacramento River and Delta water." *Westlands VI,* 153 F.Supp.2d at 1158. This conclusion was erroneous because the record fails to establish that the requirements of equitable estoppel were met. *See Lehman v. United States,* 154 F.3d 1010, 1016–17 (9th Cir.1998) (listing elements of estoppel). As discussed below, however, this issue does not affect the outcome in this case.

### B. Contract Interpretation

■ The Westlands and San Benito contracts were authorized by federal reclamation laws. *See* 43 U.S.C. §§ 485h(d), (e). Therefore, these contracts "should be interpreted against the backdrop of the legislative scheme that authorized them, and [the] interpretation of ambiguous terms or implied covenants can only be made in light of the policies underlying the controlling legislation." *Peterson v. United States Dept. of the Interior,* 899 F.2d 799, 807 (9th Cir.1990) (citing *Federal Hous. Admin. v. Darlington, Inc.,* 358 U.S. 84, 87–88, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958)), cert. denied, 498 U.S. 1003, 111 S.Ct. 567, 112 L.Ed.2d 574 (1990).

■ Since the United States is a party to both contracts, federal common law controls. *Mohave Valley Irrigation & Drainage Dist. v. Norton,* 244 F.3d 1164, 1165 (9th Cir.2001). "The Uniform Commercial Code is a source of federal common law and may be relied upon in interpreting a contract to which the federal government is a party." *O'Neill,* 50 F.3d

at 684 (applying the UCC to interpret article 11 of the Westlands contract). Accordingly, extrinsic evidence of trade usage, course of dealing, and course of performance between the parties may be considered to determine whether a contract is ambiguous. UCC § 2–202; *Mohave Valley*, 244 F.3d at 1166; *O'Neill*, 50 F.3d at 684. Appellants are not arguing that their water service contracts are ambiguous but that the district court's reliance on extrinsic evidence rendered summary judgment inappropriate. Extrinsic evidence cannot contradict a clear contract term in a final expression of agreement, but it may be used to explain or supplement the agreement. *O'Neill*, 50 F.3d at 684–85. For reasons discussed herein, the district court did not err in using extrinsic evidence in granting summary judgment to defendants and defendant-intervenors.

### C. Westlands Contract

We have previously addressed the interpretation of the Westlands Contract, specifically Article 11(a), the same article which is at issue in this case. *See O'Neill*, 50 F.3d 677. The issue in *O'Neill* was whether the contract's liability limitation is unambiguous and that an unavailability of water resulting from the mandates of valid legislation constitutes a shortage by reason of "any other causes." *Id.* at 684. We found that Article 11(a) of the Westlands contract was not ambiguous and that " 'any other causes' is a catchall phrase that does not 'explicitly' include *any* particular causes." *O'Neill*, 50 F.3d at 683.

### 1. Prior Water Rights

■ Appellants allege that the district court erred in ruling that the "first in time, first in right" principle embedded in California law gives the Exchange Contractors priority over appellants' water service allocations. Under section 8 of the Reclamation Act of 1902 (43 U.S.C. § 383), the Bureau is required to comply with state law in acquiring water rights for the diversion and storage of water by the CVP. Unlike other western states, California operates under both a riparian and appropriative water rights system. *See Gerlach Live Stock*, 339 U.S. at 742–751, 70 S.Ct. 955. Under the prior appropriation doctrine, the earliest user has the right to use the amount that has been continuously diverted, superior to rights of subsequent users based on historical beneficial use. David H. Getches, Water Law 316 (3d ed.1997). Under the riparian water law system, every landowner bordering a stream or watercourse has a right to use a reasonable quantity of water. *Id.* at 317, 70 S.Ct. 955. Under both the riparian and appropriative water rights systems, the right to water from any natural stream or water course is limited to water "reasonably required for the beneficial use to be served." *Gerlach Live Stock*, 339 U.S. at 751, 70 S.Ct. 955; *United States v. State Water Res. Control Bd.*, 182 Cal.App.3d 82, 105, 227 Cal.Rptr. 161 (1986).

■ The district court correctly set forth the priority of water users in California's dual system. "Riparians have first priority." *Westlands VI*, 153 F.Supp.2d at 1173; *State Water Res. Control Bd.*, 182 Cal.App.3d at 101–02, 227 Cal.Rptr. 161 (finding that "in times of shortage, riparians are entitled to fulfill their needs before appropriators are entitled to any use of the water"). "[I]n times of shortage, all riparians must reduce their usage proportionately because all riparians on a stream system are vested with a common ownership." *Westlands VI*, 153 F.Supp.2d at 1173. "Only after the riparians have fulfilled their needs are appropriators entitled to any water." *Id.; Meridian, Ltd. v. City & County of San Francisco*, 13 Cal.2d 424, 90 P.2d 537, 547–48 (1939). "[A]s between appropriators, the rule of priority

is 'first in time, first in right.'" *State Water Resources Control Bd.,* 182 Cal.App.3d at 102, 227 Cal.Rptr. 161.

■ The Exchange Contractors hold both pre–1914 riparian and appropriative water rights. "Exchange contractors 'exchanged' their senior rights to water in the San Joaquin River for a CVP water supply from the Delta. [The Bureau] thus guaranteed the exchange contractors a firm water supply ... Conversely, water service contractors did not have water rights to 'exchange.'" U.S. Dep't of Interior, Bureau of Reclamation, Long–Term Central Valley Project Operations Criteria and Plan (1992). When a change in the diversion point of water is made to land other than that to which the riparian right is formerly attached, "then *the law governing the right to divert is the law relating to appropriation of water, and not the law relating to riparian rights.*" *Westlands VI,* 153 F.Supp.2d at 1174 (internal quotation marks and citations omitted). Therefore, the Exchange Contractors' diverted riparian rights are treated as appropriative rights under California water law. It is illogical and unsupportable to hold that the Exchange Contractors' priority could be subordinated by the agreement entered into between the Bureau and Westlands, thereby making the enactment of the federal reclamations laws an "idle gesture." *California v. United States,* 438 U.S. 645, 688 n. 8, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978) (White, J., dissenting).

In its application to the State Water Rights Board, Westlands sought to appropriate water *"subject to vested rights."* Westlands responded to the Bureau's protest of its application by stating that it does not intend "to cause injury to those having valid vested rights ... and intends to take only that water which is in excess of the water needed to supply the valid vested rights under reasonable means of diversion and use." Therefore, there is no question that, in entering the 1963 water service contract, both Westlands and the Bureau understood that prior vested rights had priority over Westlands' water allocations.

**2. Available Water Supply and Contractual Commitments**

Pursuant to the Westlands Contract, the Bureau must "apportion the available water supply among the District and others entitled under then existing contracts to receive water from the San Luis Unit." Westlands Contract, art. 11(a). "Available water supply" is defined by the contract as "the total quantity of water from the Central Valley Project which is available for meeting the contractual commitments." *Id.* at 11(a)(ii). "Contractual commitments" are defined as "the total quantity of water agreed to be accepted during the respective year under all contracts then in force for the delivery of Central Valley Project water by the United States from the San Luis Unit." *Id.* at 11(a)(i). Thus, during years of shortage, Westlands is entitled to a pro-rata share of CVP water available from the San Luis Unit. Westlands asserts that this prorata share should also bind the Exchange Contractors, although the Exchange Contractors are not parties to Westlands' contract, hold prior water rights pre-dating the construction of the San Luis Unit, and hold separate water allocation determinations during years of shortage. Further, Westlands previously recognized that vested rights take priority over Westlands' water allocations.

The district court correctly rejected appellants' argument that "available supply" is not limited to water from the San Luis Unit, but the whole CVP. The district court reasoned:

That CVP water from outside the San Luis Unit is within (a)(ii)'s "available

supply" definition to meet contractual commitments to San Luis Unit water contractors does not mean that Interior must treat CVP water delivered as substitute water through the San Luis Unit, although not contractually committed to the Exchange Contractors from that Unit, as "available supply," or count such substitute water as available to satisfy plaintiffs' contracts. A court cannot, under the guise of construction, add words to a contract, which would impermissibly re-write that contract.

*Westlands VI,* 153 F.Supp.2d at 1162 (citing *McConnell v. Pickering Lumber Corp.,* 217 F.2d 44, 47 (9th Cir.1954)).

■ The Exchange Contractors did not specifically contract for delivery of substitute water from the San Luis Unit. The Exchange Contract anticipates that substitute water will be provided to the Exchange Contractors from the Delta–Mendota Canal. Moreover, the San Luis Unit was not even constructed at the time the Bureau and the Exchange Contractors executed the Exchange Contract. Therefore, the Exchange Contractors do not have a contract "for the delivery of [CVP] water by the United States from the San Luis Unit" defined as "contractual commitments" under the Westlands Contract. Exchange Contract water cannot be included as "available supply" under the Westlands Contract since (1) the "substitute" water provided to the Exchange Contractors is not a "contractual commitment"; and (2) the Exchange Contractors' water allocation has priority over the Westlands water service contract.

### D. Pro–Rata Allocations

Appellants contend that extrinsic evidence proves that their contractual water allocations did not intend to create a priority for the Exchange Contractors. Article 4d of the Exchange Contract provides that in any contracts between the United States and third parties for the use of San Joaquin River water, "it either will notify said parties in writing, prior to the execution of such contract, of the rights reserved to the[Exchange Contractors] … or will specifically provide for the recognition of such rights in such contract." Appellants argue that since such a subordination clause was not included in their water service contracts, but was included in other water service contracts, a priority for the Exchange Contractors was not created. Appellant's argument must fail. First, the Exchange Contractors' rights are not created in the Westlands water service contract. Second, priority of water begins on the date of beneficial use, not the date of third-party contracts. Further, neither the Westlands nor the San Benito service contract supports a finding of pro-rata distribution that includes the Exchange Contractors' water allocation.

### 1. Pro-rata water distribution under the Westlands contract

Since the Exchange Contractors' priority allocations are not included in the "available supply" and "contractual commitments" under the Westlands water service contract, it follows as a logical consequence that they are not included in the pro-rata calculation under the Westlands service contract. Additionally, the Exchange Contract, which was executed twenty-four years prior to the Westlands contract, provides the framework for determining the Exchange Contractors' water allocations during years of water shortage.

### 2. Pro-rata water distribution under the San Benito contract

The district court found that the Exchange Contractors are water-users capable of receiving water from the same project facilities as San Benito. *Westlands VI,* 153 F.Supp.2d at 1165. It also serves

as a logical consequence that the Exchange Contractor's prior rights are not included in the pro-rata calculation under the San Benito service contract. The district court did not err in finding that "substitute water delivered to the Exchange Contractors is not 'available water,' because such water is a vested priority obligation the Bureau must satisfy without including it in CVP available supply." *Id.* Therefore, "available water" under San Benito's water service contract does not include the Exchange Contractors' substitute water.

## CONCLUSION

There is no genuine issue as to any material fact concerning the interpretation of rights under the Westlands water service contract, the San Benito water service contract, and the Exchange Contract. Subjecting the Exchange Contractors to a pro-rata water allocation along with the Districts ignores the Exchange Contractors' priority to CVP water. The Westlands and San Benito Contracts do not require that the Exchange Contractors receive a pro-rata allocation along with the Districts; to the contrary, the contracts respect the Exchange Contractors' priority to CVP water.

**AFFIRMED.**